# IN THE SUPREME COURT
## STATE OF GEORGIA

_____

## CASE NO. _____
_____

## STATE OF GEORGIA,

### Petitioner,

### v.

## RONALD BARTLETT

### Respondent.
_____

On Petition for Writ of Certiorari to the Court of Appeals of Georgia,
Court of Appeals Case No. A19A0426
_____

## PETITION FOR WRIT OF CERTIORARI
_____

K. David Cooke, Jr.
**District Attorney**
Georgia Bar No. 184584
Shelley T. Milton
**Assistant District Attorney**
Georgia Bar No. 769415
**Macon Judicial Circuit**
2nd Floor, Grand Building
661 Mulberry Street
Macon, GA 31201
Telephone: (478) 621-6427

Stacey Godfrey Evans
Georgia Bar No. 298555
Arthur D. Brannan
Georgia Bar No. 076695
**Special Assistant District Attorney**
**Wargo & French LLP**
999 Peachtree Street, N.E., 26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1501

Michael G. Lambros
Georgia Bar No. 432113
**Special Assistant District Attorney**
**The Lambros Firm, LLC**
2970 Clairmont Road
Suite 240
Atlanta, GA 30329
Telephone: (404) 221-1000
Facsimile: (404) 577-3900

**ATTORNEYS FOR APPELLEE**

# TABLE OF CONTENTS

PETITION FOR WRIT OF CERTIORARI ............................................1

PRELIMINARY STATEMENT ............................................................1

NECESSITY FOR THE GRANT OF WRIT OF CERTIORARI ............5

STATEMENT OF JURISDICTION....................................................7

STATEMENT OF FACTS AND PROCEEDINGS BELOW .................7

ENUMERATION OF ERRORS.........................................................10

ARGUMENT AND CITATION TO AUTHORITY ............................11

   1.   The Court of Appeals Erred When It Found That Cash Payouts for Successful Plays on Lineup Game Machines Only Lead to Misdemeanor Charges Against Those Who Physically Make the Payouts. ...............................11

   2.   The Court of Appeals Erred When It Assumed—Without Analysis—that the Lineup Game Machines could qualify as BFCOAMs in the First Place. ............15

   3.   The Court of Appeals' Interpretation of the Gambling Statutes is Unconstitutional...........................................................................17

   4.   The Court of Appeals Split with Prior Court of Appeals and Georgia Supreme Court Precedent, Creating Confusion About the Law. ........................19

      a.   *Patel v. State*, 289 Ga. 479 (2011) ............................................20

      b.   *State v. Singh*, 291 Ga. 525 (2012) ............................................20

      c.   *Gebrekidan v. City of Clarkson*, 298 Ga. 651 (2016) ................21

      d.   *Patel v. State*, 341 Ga. App. 419 (2017) (*Patel II*) ....................23

   5.   Other Statutory Regulations Confirm that Cash Payments for Plays on Otherwise BFCOAMs Are Not Protected from Prosecution Under Georgia's Gambling Laws...........................................................................25

   6.   The Court of Appeals' Conclusion Undercuts the Purpose of Regulation of BFCOAMs and Lends to Absurd Results. ........................................27

CONCLUSION ................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All Star, Inc. v. Georgia Atlanta Amusements, LLC*,
  332 Ga. App. 1 (2015) ...............................................................14, 27

*Bartlett v. State*,
  No. A19A0426 (Ga. Ct. App. June 25, 2019) .................... 7, 8, 9, 11, 15, 17, 24

*City of Macon v. Benson*,
  175 Ga. 502 (1932) .........................................................................18

*Gebrekidan v. City of Clarkston*,
  298 Ga. 651 (2016) ................................................19, 21, 22, 23, 24

*Goldberg v. State*,
  282 Ga. 542 (2007) .......................................................................27

*Panama R. Co. v. Johnson*,
  264 U.S. 374 (1924).......................................................................19

*Patel v. State*,
  289 Ga. 479 (2011) .................................................................19, 20

*Patel v. State*,
  341 Ga. App. 419 (2017) ........................................13, 19, 20, 23, 24

*State v. Fielden*,
  280 Ga. 444 (2006) .................................................................12, 15

*State v. Singh*,
  291 Ga. 525 (2012) ...........................................................19, 20, 21

*Taylor v. State*,
  277 Ga. 764 (2004) .........................................................................7

## Statutes

O.C.G.A. § 5-6-15...........................................................................7

O.C.G.A. § 16-12-20.................................................................12, 13

Case S20G0008   Filed 08/05/2019   Page 5 of 54

O.C.G.A. § 16-12-22 ...............................................................12, 14, 20, 21, 28

O.C.G.A. § 16-12-23 ..........................................................................................12

O.C.G.A. § 16-12-24 ..........................................................................................12

O.C.G.A. § 16-12-28 ....................................................................................20, 21

O.C.G.A. § 16-12-35 .......... 10, 11, 12, 13, 14, 15, 18, 21, 22, 23, 24, 26, 27, 28, 29

O.C.G.A. § 50-27-3 ............................................................................................18

O.C.G.A. § 50-27-70 ......................................................... 2, 16, 17, 22, 25, 26, 27

O.C.G.A. § 50-27-83 ..........................................................................................26

O.C.G.A. § 50-27-85 ..........................................................................................22

O.C.G.A. § 50-27-104 ........................................................................................22

**Constitutional Provisions and Legislative Materials**

Ga. Const. art. I, § 2, ¶ VIII ......................................................................13, 17

Ga. Const. art. VI, § VI, ¶ V .............................................................................7

Ga. L. 1998, p. 563, § 2 ....................................................................................17

Ga. L. 2001, Ex. Sess., p. 312, § 3 ...................................................................17

## PETITION FOR WRIT OF CERTIORARI

THE STATE OF GEORGIA, through K. David Cooke, Jr. District Attorney for the Macon Judicial Circuit, or his duly appointed assistant, petitions this Court for a writ of certiorari to review the June 25, 2019, decision of the Georgia Court of Appeals in Case No. A19A0426, which reversed a jury's conviction of Ronnie Bartlett for commercial gambling, possession of a gambling device, and keeping a gambling place.[1]  The Court of Appeals denied the State's Motion for Reconsideration on July 15, 2019.  This Court should grant a writ of certiorari, clarify the meaning of the statutes at issue, and remand this case to the Court of Appeals for a review under the correct interpretation of the gambling statutes.

## PRELIMINARY STATEMENT

What is the constitutional limit of "legal gambling" in Georgia?  Before the Court of Appeals decision below, this was thought to be a settled question; but the opinion below creates confusion about the distinction between legal and illegal gambling, and casts doubt on the constitutionality of the limits of "legal gambling" purportedly allowed under the gambling statutes.  The decision upsets a deliberate and delicate compromise in the laws on permissible gambling in Georgia.

Georgia law allows for Lottery games, which are games of chance overseen by the Lottery and certain charitable bingo games and raffles.  Georgia law also

---

[1] A copy of the Court of Appeals decision is attached to this Petition as Exhibit A.

allows gambling for limited-value, non-cash prizes and free plays of games. For example, playing skeeball or air hockey and winning more plays or tickets redeemable for plastic toys and stuffed animals at Dave & Busters and Chucky Cheese is allowed. The law as applied to these types of games is not in dispute.

What is unclear now is whether machines with matchup or lineup games that require a nudge of a wheel to stop the game and line up the pictures on a screen ("lineup game machines") are allowed to operate in Georgia when a player receives cash payouts for successful plays on these machines. These machines are typically found in convenience stores or store fronts, meaning stores that purport to be convenience stores, but are merely home to multiple lineup game machines.

Lineup game machines are often called "coin operated amusement machines" ("COAM"). "COAM," however, is not a defined phrase and does not refer to anything authorized under Georgia law. Only "bona fide COAMs" ("BFCOAMs") are so defined and authorized. A "bona fide coin operated amusement machine" is defined as a machine played for amusement that requires at least some user skill and may lead to no award or the award of non-cash prizes for successful plays. O.C.G.A. § 50-27-70(b)(2)(A). Courts have assumed that lineup game machines qualify as BFCOAMs as long as players of those machines do not receive cash payouts for successful plays. Considering the Court of

2

Case S20G0008    Filed 08/05/2019    Page 8 of 54

Appeals' decision and reviewing the statutory scheme, this assumption is now in doubt and requires clarification from this Court.

Before the Court of Appeals' decision, the lines were clear:  offering lineup game machines for play was lawful as long as players were not given cash payouts for successful plays.  If players received vouchers for non-cash merchandise or free plays, operation of the machines was legal and those who operated or profited from such machines were not subject to prosecution under the commercial gambling laws.  However, if players did receive cash payouts for successful plays (or if other specified lines were crossed), then operation of the machines was not legal and those who operated or profited from such machines were subject to the full force of the commercial gambling laws—meaning the State could charge owners and operators of the machines with possession of a gambling device and keeping a gambling place.

Below, the Court of Appeals erred when it held that people who operate or profit from lineup game machines are exempt from prosecution under the commercial gambling statutes even when players receive cash for successful plays of their machines.  The three-judge panel below found that if a successful player of a lineup game machine received a cash payout, the State could not charge the owner or operator of that machine with possession of a gambling device or keeping a gambling place.

3

Instead, the panel held that the only person who could possibly be charged with any crime is the person who physically hands the cash to a successful player. And that person (who may or may not be the owner or operator of the machine or proprietor of a massive illegal gambling operation) would only be guilty of a misdemeanor. Indeed, under the Court of Appeals' opinion, the owner or operator of the lineup game machines could continue to operate the machines, allow new employees to make cash payouts, and continue to profit from players inserting money into the machines for the chance to win cash. This is exactly the opposite of what the Legislature prescribed. Moreover, the Court of Appeals assumed (without analysis) that lineup game machines qualify for classification as BFCOAMs in the first place.

The Court of Appeals' decision conflicts with existing Georgia Supreme Court precedent, other panel decisions from the Court of Appeals, and other statutes. Until the decision below, case law was clear that if a person gives cash payments for successful plays on the lineup game machines, then use of the machines was illegal and the operators and owners were subject to the full force of the commercial gambling statutes. And if the Court of Appeals is correct that the gambling statutes provide no punishment of those who purposefully offer the public illegal gambling on lineup game machines by facilitating cash payments for

4

successful plays, are those statutes constitutional given the Georgia Constitution's prohibition on casino gambling?

## NECESSITY FOR THE GRANT OF WRIT OF CERTIORARI

This case is not about one gambling conviction. It is about the extent to which gambling is allowed in Georgia, the confines of which are of great concern, gravity, and importance to the public. Citizens must know what is legal and what is illegal, so they do not break the law, and businesses need to know the limits on the play of lineup game machines. A three-judge panel of the Court of Appeals issued an opinion that re-writes statutory law, conflicts with Georgia Supreme Court precedent, creates unconstitutional results, and causes confusion about the type and extent of lawful gambling in Georgia. This Court should review the decision and clarify the law.

The Court of Appeals essentially rewrote Georgia's commercial gambling statutes to allow gambling for cash on lineup game machines in Georgia by taking away the ability to prosecute those who offer such illegal gambling to the public. The decision conflicts with precedent from this Court. The Court of Appeals cannot re-write statutes or ignore precedent from this Court, and neither the Legislature nor the Court of Appeals can offend Georgia's Constitution, and any statute or decision allowing illegal gambling does just that. The Court of Appeals' mistake removes any meaningful punishment for illegal gambling on lineup game

5

machines and puts the public at harm to the increased ills that naturally flow from illegal gambling—all without legislative action or the citizens' approval of a constitutional amendment to allow gambling in our State.

If the Court of Appeals' misinterpretation stands, then law enforcement cannot effectively punish owners or operators of illegal gambling operations. Law enforcement could not arrest the owners or operators of lineup game machines unless they were also the people who physically paid out cash for successful plays on an otherwise BFCOAM. Thus, owners and operators of otherwise BFCOAMs can knowingly allow their employees to pay out cash for successful plays on those machines and only the employee is subject to any criminal liability, and then only a misdemeanor.

If the Court of Appeals' misinterpretation stands, then the commercial gambling statutes allow unconstitutional casino gambling in this State as long as the gambling is done on a BFCOAM—even though once cash is paid for successful plays on any machine, the machine no longer qualifies as a BFCOAM. Unconstitutional statutes cannot stand.

This Court should not allow a decision to stand that will subject Georgia citizens to the extreme harms that flow from illegal gambling without a vote to change the state constitution and willingly accept these harms. Further, this Court

6

should not allow a decision to stand that takes away the Legislature's ability to pass laws to keep its citizens protected from those harms.

## STATEMENT OF JURISDICTION

This Court "has jurisdiction to review any decision of the Court of Appeals by certiorari so long as the criteria of the writ are satisfied." *Taylor v. State*, 277 Ga. 764, 764 (2004); *see also* Ga. Const. art. VI, § VI, ¶ V ("The Supreme Court may review by certiorari cases in the Court of Appeals which are of gravity or great public importance); O.C.G.A. § 5-6-15.

## STATEMENT OF FACTS AND PROCEEDINGS BELOW

Defendant Bartlett co-owned Captain Jack's Crab Shack ("Captain Jack's"), located in Byron, Peach County, Georgia. *Bartlett v. State*, No. A19A0426 at 2 (Ga. Ct. App. June 25, 2019), *reconsideration denied* (July 15, 2019). Captain Jack's included a game room with nine lineup game machines. *Id.* In early 2015, Sergeant Melanie Bickford with the Byron Police Department began to investigate Captain Jack's after receiving complaints of illegal gambling. *Id.* Another officer, Christine Welch, helped with the undercover work of the investigation. *Id.*

Officer Welch visited Captain Jack's six times in the Spring of 2015. *Id.* at 3. Her task was to play the machines to see if she would receive cash payouts. *Id.* She recorded her visits. *Id.* On each visit, Officer Welch inserted money in a machine, chose which games to play, and placed a wager. *Id* at 3-4. After

7

Case S20G0008   Filed 08/05/2019   Page 13 of 54

spinning the wheels, she pressed a separate button to lower one of the wheels to attempt to make three matches across the middle of the screen. *Id.*[2] When she finished her play, she pushed the button to end the game session and then went to the bar where the bar attendant gave her a certificate for her accumulated credits. *Id.* She took the certificate to the register at the front of Captain Jack's where she received a minimal-value lottery ticket and the remaining amount in cash. *Id.* **It is undisputed that she was paid out in cash during each of her six trips.** *Id.*

Based on the investigation, the State issued a warrant to search Captain Jack's in May of 2015 and seized the nine game machines. *Id* at 4. The State charged Bartlett in October 2016 with Georgia RICO Act violations, commercial gambling, possession of a gambling device, keeping a gambling place, and false writings. *Id.*

During trial, customer Karen Briscoe also testified about the use of the machines. *Id* at 4-5. Briscoe testified that she played the machines and redeemed her winnings for a combination of lottery tickets, meal vouchers, and cash. *Id.* Christopher Edwards, an expert in forensic accounting, examined Captain Jack's business records and testified that he identified $4,400,000 in cash received via the machines from October 2013 through May 2015, with $2,400,000 unaccounted for

---

[2] The State's case included testimony that the machines did not require a skilled "nudge" to complete all plays. *Id.* at 4. The Defendant disputed this testimony. Resolution of this conflict is not required to examine and reverse the decision below.

in the records.  *Id.* at 6.  He concluded that Captain Jack's must have paid out cash to players.  *Id.*  The State also introduced evidence of prior cash payouts through the testimony of Sergeant Ashley Greer.  *Id* at 6-7.

After the State's presentation, the Defendant moved for a directed verdict, which the trial court denied.  Defendant then presented evidence of several expert witnesses, including Nick Farley and Mark Nizdil.  *Id* at 7.  Farley testified about testing, certification, and compliance of the machines.  *Id* at 7-8.  Nizdil testified about how the machines communicate financial data to the Georgia Lottery Corporation ("GLC").  *Id.* at 8-9.

After considering the evidence, the jury convicted Bartlett of commercial gambling, possession of a gambling device, and keeping a gambling place.  *Id* at 9.  Defendant was sentenced to a prison term of five years (two years in confinement).  *Id.*  Defendant filed his Notice of Appeal on March 21, 2018.  On June 25, 2019, the Court of Appeals reversed the conviction, finding that the trial court erred in denying Defendant's motion for a directed verdict because no felony conviction was possible for making cash payouts.  *Id.* at 15.[3]  The Court of Appeals denied the State's Motion for Reconsideration on July 15, 2019.[4]

---

[3] The Court of Appeals should have also upheld the verdict because of testimony that a skilled "nudge" was not always required to complete machine plays.

[4] A copy of the Court of Appeals' denial of the motion for reconsideration is attached to this Petition as Exhibit B.

## ENUMERATION OF ERRORS

1.      The Court of Appeals erred when it incorrectly interpreted O.C.G.A. § 16-12-35 to limit the possible punishment for cash payouts following successful play on lineup game machines to a misdemeanor against the person physically making the cash payouts.  When a player receives a cash payout for a successful play on a lineup game machine, the use of the machine loses the safeguard that prevents prosecutions, including felonies, under the gambling statutes.

2.      The Court of Appeals erred when it assumed—without analysis—that lineup game machines were bona fide coin operated amusement machines.  The three-judge panel failed to consider that a lineup game machine cannot qualify as a BFCOAM if cash is offered as a reward for successful plays of the machine, and this Court should examine whether a lineup game machine can ever qualify as a BFCOAM.

3.      The Court of Appeals erred when it held that despite cash payouts to players of lineup game machines, owners and operators could continue to operate the machines without punishment for operating a gambling place.  This is an unconstitutional result because it condones casino gambling, which violates the Georgia Constitution.

4.      The Court of Appeals erred when it issued an opinion that conflicted with Georgia Supreme Court precedent and other panel decisions from the Court of

Appeals. Before the three-judge panel below, the law was clear that cash payouts for successful plays on lineup game machines opened the machines' owners and operators to prosecution under the gambling statutes.

     5.    The Court of Appeals erred when it interpreted O.C.G.A. § 16-12-35 in a way that conflicted with other statutes and rendered them superfluous. Courts cannot re-write statutes to render other statutes worthless.

     6.    The Court of Appeals erred when it interpreted the gambling statutes in a way that undercuts the purpose of the statutes and creates absurd results.

## ARGUMENT AND CITATION TO AUTHORITY

     The Court of Appeals misapplied and misinterpreted O.C.G.A. § 16-12-35. In so doing, the three-judge panel made the statute unconstitutional, issued an opinion that conflicts with Georgia Supreme Court precedent and other statutes, and created the potential for absurd results.

**1. The Court of Appeals Erred When It Found That Cash Payouts for Successful Plays on Lineup Game Machines Only Lead to Misdemeanor Charges Against Those Who Physically Make the Payouts.**

     The Court of Appeals erred in finding that O.C.G.A. § 16-12-35(e) through (g) provides the exclusive remedy when a player receives cash for a successful play on a lineup game machine. *See Bartlett*, No. A19A0426 at 13-15. The Court of Appeals should not have foreclosed the possibility that this conduct could also provide an evidentiary basis for separate violations of Georgia's other gambling

11

laws if the illegal conduct meets the elements for those separate offenses, including O.C.G.A. §§ 16-12-22(a)(1), 16-12-24(a), and 16-12-23(a).

The language in the misdemeanor sections (O.C.G.A. § 16-12-35 (e) through (g)) does not itself foreclose prosecution under the commercial gambling statutes in addition to a misdemeanor prosecution. This panel of the Court of Appeals cannot rewrite the statutes to impose an exclusivity provision that does not exist in the language of those sections. *See State v. Fielden*, 280 Ga. 444, 448 (2006) ("[The] Court does not have the authority to rewrite statutes.").

Further, the Court of Appeals' conclusion is not supported by a fair reading of Georgia's gambling laws. A "gambling device" is defined as anything that allows a player to exchange something of value for the chance to win something of value, whether or not that something is money:

> "Gambling device" means [a]ny contrivance which for a consideration affords the player an opportunity to obtain money or other thing of value, the award of which is determined by chance even though accompanied by some skill, whether or not the prize is automatically paid by contrivance.

O.C.G.A. § 16-12-20(2)(A).[5]

Lineup game machines—even those operating legally—qualify as gambling devices because they offer players the opportunity to obtain things of value (e.g., free replays, merchandise, and other noncash redemption options), and the award

---

[5] There are three additional types of "gambling devices" as defined by the statute. *See* O.C.G.A. § 16-12-20(B) through (D).

received is determined by chance even though the machine games involve an element of skill. *See Patel v. State*, 341 Ga. App. 419, 420 (2017), *cert. dismissed* (Oct. 16, 2017) (acknowledging that the machines, even those compliant with Georgia law and the GLC's regulations, are technically gambling devices); O.C.G.A. §§ 16-12-20(2)(A) (defining gambling devices); 50-27-70 (b)(2)(A) (defining BFCOAM); 50-27-70 (b)(4) (defining Class B machine).

Our Constitution prohibits gambling, as do our penal statutes. Ga. Const. art. I, § 2, ¶ VIII; O.C.G.A. §§ 16-12-20 *et. seq.* Despite these prohibitions, the Legislature has specifically defined how "a coin operated game or device designed and manufactured for bona fide amusement purposes" may be used without risking prosecution under the gambling laws. *See* O.C.G.A. § 16-12-35(b), (c), and (d).

Section 16-12-35(d)(1) provides a narrow safe harbor for use of BFCOAMs: "Nothing in this part shall apply to a coin operated game or device designed and manufactured only for bona fide amusement purposes which involves some skill in its operation **if it rewards the player exclusively with [noncash award options]**."[6] O.C.G.A. § 16-12-35(d)(1) (emphasis added) (this statute is referred to herein as "safe harbor"). In other words, lineup game machines are gambling

---

[6] Besides not allowing for cash payouts, the statute also requires that machine play must involve "some skill" to qualify as a BFCOAM. The State disputes that the machines here met the "some skill" requirement. But resolution of that issue is unnecessary for a review of this case to correct the interpretation of Georgia's gambling laws.

devices that "have been permitted to operate in this state only by the grace of the [L]egislature." *All Star, Inc. v. Georgia Atlanta Amusements, LLC*, 332 Ga. App. 1, 11 (2015). Lineup game machine operators lose this grace when they fail to meet any one of the requirements of O.C.G.A. § 16-12-35, including making cash payouts.

The safe harbor of O.C.G.A. § 16-12-35(d) shields the use of BFCOAMs from Georgia's gambling laws governing the use of gambling devices. If the use of these machines does not match the plain restrictions prescribed by the safe harbor, those who own or operate the machines lose the protection it affords. Because payment of money for successful plays does not comport with the clear restrictions placed on the use of BFCOAMs, making such payments negates the exception to prosecution under the gambling laws otherwise afforded by the safe harbor. As a result, the payment of money for winning plays on BFCOAMs may constitute evidence of other, separate violations of Georgia's gambling laws, including those statutes with which the State charged the Defendant. For example, a defendant could be found guilty of intentionally operating and participating in the earnings of a gambling place under O.C.G.A. § 16-12-22. This is true on top of him or others being guilty of a misdemeanor for physically paying out cash for plays.

14

The Court of Appeals misconstrued the law and did not consider that payments of money for winning plays could be evidence of other violations of Georgia's gambling laws—separate and apart from the misdemeanor offenses. There is no exclusivity provision in the misdemeanor statutes that preclude the State from charging under the commercial gambling statutes and the Court of Appeals cannot insert one. *See Fielden*, 280 Ga. at 448. Thus, the Court of Appeals prematurely concluded its analysis of whether there was sufficient evidence to uphold the jury's convictions under the commercial gambling statutes. *Bartlett*, No. A19A0426 at 15. ("Thus, where the State chose not to charge Bartlett with a misdemeanor under O.C.G.A. § 16-12-35(e), (f), or (g), but instead elected to charge him under the commercial gambling statutes that [BF]COAMs are specifically exempted from, the evidence was insufficient as a matter of law to convict him of Counts 5, 6, and 7.").

## 2. The Court of Appeals Erred When It Assumed—Without Analysis— that the Lineup Game Machines could qualify as BFCOAMs in the First Place.

The courts have historically assumed that lineup game machines could qualify as BFCOAMs without analyzing whether these types of machines meet the statutory definition of a BFCOAM. As discussed above, even if a lineup game machine can qualify as a BFCOAM, it can lose that qualification if successful players of those machines receive cash payouts. But this Court should consider

15

whether a lineup game machine—even without cash payouts for successful

plays—can meet the definition of a BFCOAM in the first place.

A BFCOAM is a machine used by the public for amusement that provides

no awards at all or provides lawful awards (i.e., non-cash merchandise or free

replays) to successful players:

> "Bona fide coin operated amusement machine" means every machine
> of any kind or character used by the public to provide amusement or
> entertainment whose operation requires the payment of or the
> insertion of a coin, bill, other money, token, ticket, card, or similar
> object and the result of whose operation depends in whole or in part
> upon the skill of the player, whether or not it affords an award to a
> successful player pursuant to subsections (b) through (g) of Code
> Section 16-12-35 [free replays or non-cash merchandise not exceeding
> $5.00 per play], and which can be legally shipped interstate according
> to federal law.

O.C.G.A. § 50-27-70(b)(2)(A).[7]  The definition of BFCOAM also includes a non-

exclusive list of examples of what constitutes a BFCOAM.  *Id.*  Lineup game

machines are not on the enumerated list of examples.

Along with the examples, the list includes "[a]ny other *similar* amusement

machine which can be legally operated in Georgia."  *Id.* at (xxv) (emphasis added).

Even a lineup game machine for which a successful player does not receive a cash

---

[7] Below, Bartlett argued that the "whether or not it affords an award to a successful
player" language in this definition means that even if cash payouts are allowed, the
machine is a BFCOAM.  That argument is wrong considering the next part
modifies "award" with "pursuant to 16-12-35(b) through (g)," which means the
award must not be cash.  If this definition were read to allow cash payouts, the
statute would be unconstitutional.  *See* Section C below.

Case S20G0008    Filed 08/05/2019    Page 22 of 54

payout is not "similar" to any other machine on the enumerated list, which consists of arcade like games such as pinball, foosball, shuffleboard, skeeball, air hockey, and racing games.  *Id.*

Further, the Legislature intentionally removed lineup game machines from the enumerated list.  From 1998 to 2001, the enumerated list of examples included "[m]atchup or lineup games which require the player to use skill stops to complete the game."  Ga. L. 1998, p. 563, § 2.  The Legislature removed this enumerated example in 2001.  Ga. L. 2001, Ex. Sess., p. 312, § 3.  Bartlett and countless other defendants have argued that the skill required in the lineup game machines is that a player must "nudge" the wheel to make matching combinations of pictures on the screen.  *See* Brief for Appellant at 28, *Bartlett* (No. A19A0426).  That "nudge" completes the game.  Thus, these lineup game machines that require the player to use a skilled "nudge" to complete the game are the very type of machines removed from the enumerated list of examples of a BFCOAM in 2001.  So why has the industry been allowed to continue to operate them?  An examination is in order.

### 3.  The Court of Appeals' Interpretation of the Gambling Statutes is Unconstitutional.

Georgia's Constitution outlaws "casino gambling."  It states, "Except as herein specifically provided in this Paragraph VIII, all lotteries, and the sale of lottery tickets, and all forms of pari-mutuel betting and casino gambling are hereby prohibited; and this prohibition shall be enforced by penal laws."  Ga. Const. art. I,

Case S20G0008    Filed 08/05/2019    Page 23 of 54

§ 2, ¶ VIII.  "Casino gambling" is defined in O.C.G.A. § 50-27-3 as a "location or business for the purpose of conducting **illegal gambling activities**, but excluding the sale and purchase of lottery ticket or shares as authorized by this chapter."  O.C.G.A. § 50-27-3(7) (emphasis added).  Thus, if a location or business operates for the purpose of illegal gambling, that conduct violates the Constitution's prohibition of "casino gambling."

It is illegal to pay lineup game machine players cash as awards for winning plays—this is true even if the conduct only constitutes a misdemeanor offense as the Court of Appeals maintains.   Thus, when cash payouts occur, illegal gambling occurs.  Hence, where locations or businesses purposely operate to provide cash payments as awards for successful lineup game machine plays, casino gambling occurs.

If the statute does not allow punishment of the machine owner or operator for keeping a gambling place—possible under the Court of Appeals' interpretation of O.C.G.A. § 16-12-35—the statute is unconstitutional because it would allow a location operator to run a casino gambling location without violating the law.

This unconstitutional interpretation cannot stand.  The canon of constitutional avoidance provides that if one plausible reading of a statute would raise "grave doubt" about the statute's constitutionally, a court should look for another, "fairly possible" reading that would avoid the constitutional issue.  *City of*

18

Case S20G0008 Filed 08/05/2019 Page 24 of 54

*Macon v. Benson*, 175 Ga. 502 (1932) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." (quoting *Panama R. Co. v. Johnson*, 264 U.S. 374 (1924))).  Under the correct interpretation of Georgia's gambling statues, as discussed above, the operator of a casino gambling location would be subject to punishment under Georgia's gambling laws for illegally operating a gambling place and there would be no constitutional issue with the statutory construction.

### 4. The Court of Appeals Split with Prior Court of Appeals and Georgia Supreme Court Precedent, Creating Confusion About the Law.

The Court of Appeal's interpretation is inconsistent with Supreme Court authority and at least one prior Court of Appeals decision.   *See State v. Singh*, 291 Ga. 525, 528-29 (2012); *Patel v. State*, 289 Ga. 479 (2011); *Patel v. State*, 341 Ga. App. 419, 419-20 (2017), *cert. dismissed* (Oct. 16, 2017) (hereinafter, *Patel II*). The courts in these cases have recognized that the misuse of BFCOAMs through making cash payouts can, in fact, support a prosecution for violating Georgia's other gambling laws if the illegal conduct meets the elements for those offenses. This Court's decision in *Gebrekidan v. City of Clarkston*, 298 Ga. 651 (2016)—the only case cited by the Court of Appeals as justification for its analysis below—does not support the erroneous interpretation and indeed is not relevant to the issues of this case at all.  These cases are each briefly discussed below.

19

### a. *Patel v. State*, 289 Ga. 479 (2011)

In a 2011 case from this Court, *Patel v. State*, the defendants argued, among other things, that the machines at issue fell outside the definition of commercial gambling. This Court noted that there was no evidence that the machines required any skill and stated that "even property that is lawful to possess and operate can be used to violate the law…." *Patel*, 289 Ga. at 485. Thus, this Court recognizes that even if a lineup game machine could be a BFCOAM, it could lose that status if used illegally, i.e., if cash payouts are made for successful plays on the machine.

### b. *State v. Singh*, 291 Ga. 525 (2012)

In *State v. Singh*, a 2012 decision from this Court, the defendant argued "that the machines at issue were legal and that the alleged illegal activity set forth in the complaint—making cash payments for successful play—is a misdemeanor and, therefore, does not constitute a predicate felony necessary to sustain a Georgia RICO claim." *Singh*, 291 Ga. at 528-29. That argument is much like what the Court of Appeals held below.

But in *Singh*, the trial court "refuted Singh's argument that the complaint did not state a claim on the basis that the machines were legal because the trial court reasoned that legal machines could still be used for an illegal purpose. The trial court went on to conclude that the complaint alleged felony violations under O.C.G.A. §§ 16-12-22 and 16-12-28 and, therefore, declined to dismiss the

20

complaint." *Id.* On appeal, this Court sustained the trial court's denial of the motion to dismiss, *id.* at 529, because making cash payments for successful plays on lineup game machines is a sufficient allegation in support of felony violations under O.C.G.A. §§ 16-12-22 and 16-12-28.

Under the Court of Appeals' analysis, however, this Court would have needed to reverse the trial court's denial of the defendant's motion to dismiss because paying out cash for winning plays would have only been a misdemeanor offense under O.C.G.A. § 16-12-35 (e) through (g) and such an allegation could not have supported charges brought under O.C.G.A. §§ 16-12-22 or 16-12-28.

### c. *Gebrekidan v. City of Clarkson*, 298 Ga. 651 (2016)

Rather than relying on this Court's precedent that specifically addresses cash payouts for successful plays on otherwise BFCOAMs, the Court of Appeals erroneously relied on *Gebrekidan*, a decision inapplicable to the issues here. *Gebrekidan* concerned whether state law preempted a local ordinance. 298 Ga. at 651. This Court in *Gebrekidan* in no way addressed, much less analyzed, illegal use of purported BFCOAMs or the interplay between the different state gambling statutes. In *Gebrekidan*, the defendant was convicted in municipal court of violating a local city ordinance that prohibited BFCOAMs in retail stores that sell alcohol. *Id.* at 651. On review, this Court only considered and decided whether the *State's* statutory scheme regulating BFCOAMs (which does not prohibit all

21

alcoholic beverage licensees from allowing BFCOAMs on the premises)

preempted the *city's* ordinance (which did). *Id.*

In its analysis, this Court noted the comprehensive, but not exclusive, state

regulations for BFCOAM businesses in O.C.G.A. § 50-27-70 to 50-27-104. *Id.* at

656-57. This Court also noted that use of BFCOAMs is protected from Georgia's

criminal laws against gambling if the BFCOAMs fit the exception in O.C.G.A. §

16-12-35. *Id.* at 656. This Court gave examples of misuse of the machines and

examples of penalties for certain misuses:

> It is a crime to misuse [BF]COAMs, **such as** by paying cash for
> successful plays, and there are numerous penalties for violating other
> provisions of the complex statutory scheme, **such as** provisions
> requiring the filing of reports. *See* O.C.G.A. §§ 16-12-35, 50-27-85.

*Id.* at 657 (emphasis added). According to this Court's own language, these are

simply <u>examples</u> and are not the exclusive crimes or penalties associated with the

misuse of purported BFCOAMs. *Gebrekidan* definitively does **<u>not</u>** conclude that

paying cash for successful plays on a BFCOAM is punishable only under

O.C.G.A. § 16-12-35.

*Gebrekidan* did <u>not</u> concern illegal use of otherwise BFCOAMs; it did <u>not</u>

concern cash payments for winning plays; it did <u>not</u> concern illegal gambling; it

did <u>not</u> concern whether cash payments may be evidence of commercial gambling;

it did <u>not</u> concern the interpretation of the state's gambling laws. In sum, this

Court in *Gebrekidan* did not analyze, decide, find, conclude or otherwise make a

22

definitive statement on issues relevant here.  Thus, the Court of Appeals' reliance on that case to support its proposition that making cash payouts for winning plays on BFCOAMs cannot be evidence to support felony charges under Georgia's commercial gambling laws is improper and distorts the law.

### d. *Patel v. State*, 341 Ga. App. 419 (2017) (*Patel II*)

The Court of Appeals decided *Patel II* more than a year after *Gebrekidan*. *See Gebrekidan*, 298 Ga. 651 (2016); *Patel II*, 341 Ga. App. 419 (2017).[8]  Not only did the *Patel II* panel have the benefit of *Gebrekidan* before it made its decision, the appellant in *Patel II* relied on *Gebrekidan* in support of his unsuccessful arguments that cash payments could only constitute a misdemeanor offense under O.C.G.A. § 16-12-35.  *See* Brief for Appellant at 8, 13-14, *Patel II* (No. A17A0067).  Because the holdings in *Gebrekidan* did not fit that case, as they do not fit here, *Gebrekidan* did not affect *Patel II*.

In *Patel II*, the Georgia Court of Appeals reviewed the trial court's conclusion that misusing otherwise BFCOAMs by giving players cash and lottery tickets for winning games was sufficient conduct to support the State's forfeiture action.   The Court of Appeals agreed.  *Patel II*, 341 Ga. App. at 419-20.  The Court of Appeals held that the trial court did not err in approving the State's forfeiture because the ***defendants' actions violated the gambling laws of***

---

[8] This Court decided *Gebrekidan* in March 2016.  The Court of Appeals decided *Patel II* in May 2017.  This Court denied certiorari of *Patel II* in October 2017.

23

*Georgia*—effectively concluding that the safe harbor exception did not apply: "[T]hese actions clearly violated the gambling laws of Georgia, which prohibit cash payouts for winning games on machines when the winnings are determined by chance even if they involve an element of skill." *Id.*

Under the Court of Appeals' statutory analysis here, the *Patel II* appellate panel could not have upheld the forfeiture because the consequences for paying out cash as winnings would have been limited to the misdemeanor offenses in O.C.G.A. § 16-12-35 (e) through (g), which do not include forfeiture.

Additionally, the appellant in *Patel II* petitioned this Court for certiorari on the specific basis that the Court of Appeals' decision went against this Court's holding in *Gebrekidan*. *See* Petition for Writ of Certiorari for Appellant at 5, *Patel II* (No. S17C1777). This Court **denied** appellant's petition for certiorari. As in *Patel II*, *Gebrekidan* is not relevant to issues here regarding the misuse of otherwise BFCOAMs for illegal gambling purposes.

While the Court of Appeals correctly acknowledges that "O.C.G.A. § 16-12-35(e) through (g) expressly governs the consequences for making cash payouts" and that O.C.G.A. § 16-12-35(e) through (g) "plainly states that the misuse of a [BF]COAM by paying cash for winning plays constitutes a misdemeanor," *Bartlett* at 12, 14, none of these provisions provide an *exclusive* consequence for cash payouts or related activity. Thus, to conclude that this conduct cannot also provide

24

an evidentiary basis, at least in part, for separate violations of Georgia's other gambling laws is inherently inconsistent with Supreme Court and prior Court of Appeals decisions involving the interplay between Georgia's gambling laws and the misuse of otherwise BFCOAMs by making cash payments for winning plays.

### 5. Other Statutory Regulations Confirm that Cash Payments for Plays on Otherwise BFCOAMs Are Not Protected from Prosecution Under Georgia's Gambling Laws.

The legal operation of BFCOAMs is regulated by O.C.G.A. § 50-27-70 *et. seq.*, and enforced by the GLC.  These statutes include findings by the General Assembly that the "ability to operate a bona fide coin operated amusement machine business in this state constitutes a privilege and not a right," and that the State needs to "prevent the unregulated operation of the bona fide coin operated amusement machine business," and enact protections "which will aid in the enforcement of the tax obligations that arise from the operation of bona fide coin operated amusement machine businesses **as well as prevent unauthorized cash payouts**."  O.C.G.A. § 50-27-70(a) (emphasis added).

To advance the General Assembly's stated purpose "to prevent unauthorized cash payouts," the statute states that successful players of BFCOAMs can receive a legal award or no award at all:

> "Bona fide coin operated amusement machine" means every machine of any kind or character used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, card, or similar

25

object and the result of whose operation depends in whole or in part upon the skill of the player, whether or not it affords an award to a successful player **pursuant to subsections (b) through (g) of Code Section 16-12-35**….

O.C.G.A. § 50-27-70(b)(2)(A) (emphasis added).

Moreover, O.C.G.A. § 50-27-70 goes on to define Class B BFCOAMs (the class at issue here) as requiring that awards for successful plays comply with the noncash award options permitted under O.C.G.A. § 16-12-35(d):

> "Class B machine" means a bona fide coin operated amusement machine that allows a successful player to accrue points on the machine and carry over points won on one play to a subsequent play or plays in accordance with paragraph (2) of subsection (d) of Code Section 16-12-35 and:
> (A) **Rewards a successful player in compliance with the provisions of paragraphs (1) and (2) of subsection (d) of Code Section 16-12-35**; and
> (B) Does not reward a successful player with any item prohibited as a reward in subsection (i) of Code Section 16-12-35 or any reward redeemable as an item prohibited as a reward in subsection (i) of Code Section 16-12-35.

O.C.G.A. § 50-27-70(b)(4) (emphasis added).

The General Assembly also stated that nothing in Article 3 of Chapter 27 of Title 50 (which provides for the regulation of BFCOAMs) "shall be construed or have the effect to license, permit, authorize, or legalize any machine, device, table, or bona fide coin operated amusement machine the keeping, exhibition, operation, display, or maintenance of which is in **violation of the laws or Constitution of this state**."  O.C.G.A. § 50-27-83 (emphasis added).

26

Case S20G0008    Filed 08/05/2019    Page 36 of 54

The statutes do not exempt the use of BFCOAMs from Georgia's commercial gambling laws by section 16-12-35(d) or sections 50-27-70 *et. seq.* if cash payouts are made—because the machines are no longer BFCOAMs if cash is paid out.  If the law is interpreted to preclude prosecution under the gambling laws when a player receives cash payouts for successful plays, then the language of the sections quoted above are rendered worthless, which courts cannot do.  *See Goldberg v. State*, 282 Ga. 542, 546-547 (2007) ("[I]t is a basic rule of construction that a statute or constitutional provision should be construed to make all its parts harmonize and to give a sensible and intelligent effect to each part, as it is not presumed that the legislature intended that any part would be without meaning." (citation and punctuation omitted)).

**6. The Court of Appeals' Conclusion Undercuts the Purpose of Regulation of BFCOAMs and Lends to Absurd Results.**

The purpose of regulating BFCOAMs is to "aid in the enforcement of the tax obligations that arise from the operation of bona fide coin operated amusement machine businesses as well as ***prevent unauthorized cash payouts***." *All Star, Inc.*, 332 Ga. App. at 12 (emphasis added); O.C.G.A. § 50-27-70.  Indeed, deterring misuse of BFCOAMs by making cash payments is so important that the General Assembly provided that a person who makes even one cash payment to another person for successful plays on BFCOAMs, no matter how small the monetary award, is guilty of a misdemeanor.  *See* O.C.G.A. § 16-12-35.

The Legislature specifically added these misdemeanor offenses to supplement the other commercial gambling offenses in the context of misuse of BFCOAMs, not to replace the other gambling offenses for all situations involving the misuse of BFCOAMs by providing winning players with cash awards. Without the misdemeanor offense there is no criminal penalty for the person who commits the *physical act* of the cash payout, but only for the individuals operating or profiting from gambling devices. *Compare* O.C.G.A. § 16-12-22 *with* O.C.G.A. § 16-12-35. In other words, by including certain misdemeanor offenses in O.C.G.A. § 16-12-35, the Legislature sought to **add** penalties for BFCOAM cash payouts, not limit them.

Under the Court of Appeals' interpretation of the gambling statutes, however, those who intentionally operate gambling places and illegally make millions of dollars would only be subject to misdemeanor charges, as long as those individuals misuse BFCOAMs, as opposed to other gambling devices, in the process. Under the Court of Appeals' analysis, misusing BFCOAMs would shield a commercial gambling operator from felony charges. A misdemeanor slap on the wrist is no deterrent to prevent paying cash for plays on otherwise BFCOAMs; it would be a small price to pay for being able to illegally make and keep millions of dollars, even after prosecution. The Court of Appeals' interpretation provides a

28

Case S20G0008 Filed 08/05/2019 Page 34 of 54

loophole for illegal gambling, which does not support the General Assembly's intent to deter illegal gambling and Georgia's Constitution prohibiting it.

In addition, consider the other prohibitions laid out in O.C.G.A. § 16-12-35(h) and (i), which prohibit out-of-store redemptions or redemptions for firearms, alcohol, or tobacco, respectively. O.C.G.A. § 16-12-35 (h), (i). Anyone who commits multiple of these violations shall be guilty of a felony. O.C.G.A. § 16-12-35(g.1). Yet under the Court of Appeals' analysis of O.C.G.A. § 16-12-35, a player can walk up to the redemption counter after successfully playing an otherwise BFCOAMs, redeem his winnings for cash and then use that cash to purchase firearms, alcohol, and tobacco at the same location. As a result, the person who essentially gave a player contraband items in exchange for lineup game machine winnings gets to skirt the law and could forever avoid felony charges because that person technically gave money for winning plays, which the Court of Appeals decided could only constitute a misdemeanor offense.

## CONCLUSION

This Court must correct the Court of Appeals' misconstruction of the gambling statutes because its statutory interpretation is not only wrong, but also unconstitutional. The decision casts doubt on whether the machines at issue here could ever fit into Georgia's legal gambling confines. The Court of Appeals decision also splits from prior existing precedent from this Court, prior Court of

29

Appeals panels, and it clashes with other statutes.  Moreover, the Court of

Appeals' reading of the gambling statutes does not deter cash payments as the

General Assembly intended.  This Court should revisit the decision below and

clarify the gambling laws in Georgia.


       Respectfully submitted, this <u>5th</u> day of August 2019.

K. DAVID COOKE, JR.   184584
District Attorney

*/s/ Stacey Godfrey Evans*
Stacey Godfrey Evans
Georgia Bar No. 298555
Arthur D. Brannan
Georgia Bar No. 076695
**Special Assistant District Attorney**
**Wargo & French LLP**
999 Peachtree Street, N.E., 26th Floor
Atlanta, Georgia 30309
Telephone: (404) 953-1500
Facsimile: (404) 261-3656

*/s/ Shelley T. Milton*
Shelley T. Milton
Assistant District Attorney
Georgia Bar No. 769415
**Macon Judicial Circuit**
2nd Floor, Grand Building
661 Mulberry Street
Macon, GA 31201
Telephone: (478) 621-6427

## CERTIFICATE OF SERVICE

I certify that on August 5, 2019, I electronically filed the within and foregoing **PETITION FOR WRIT OF CERTIORARI** via the SCED E-filing system, with notice of same being served by U.S. Mail, addressed to the following:

| | |
|---|---|
| Michael J. Bowers | Charles E. Cox, Jr. |
| Christopher S. Anulewicz | Charles E. Cox, Jr. LLC |
| Balch & Bingham LLP | 1950 Northside Crossing |
| 30 Ivan Allen Jr. Blvd., N.W., Suite 700 | P.O. Box 67 |
| Atlanta, GA 30308 | Macon, GA 31202 |

*/s/ Stacey Godfrey Evans*
Stacey Godfrey Evans
Georgia Bar No. 298555

# Exhibit A

**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**MCMILLIAN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 25, 2019**

# In the Court of Appeals of Georgia

A19A0426. BARTLETT v. THE STATE.

MCMILLIAN, Judge.

Following a jury trial in February 2018, Ronnie Bartlett was convicted of one count of commercial gambling, one count of possession of a gambling device, and one count of keeping a gambling place. Bartlett now appeals, asserting that the trial court erred (1) in its charge to the jury; (2) in denying his motion for general demurrer and directed verdict of acquittal; (3) in denying his motion in limine to exclude certain evidence; and (4) in denying his motion to disqualify counsel. For the reasons that follow, we find the evidence was insufficient as a matter of law to support his convictions and therefore reverse.

Viewed in the light most favorable to the jury's verdict,[1] the evidence adduced at trial shows that Bartlett co-owned a restaurant called Captain Jack's Crab Shack ("Captain Jack's") in Byron, Georgia with his wife. Captain Jack's included both a dining area and a separate game room that contained nine coin operated amusement machines ("COAMs").[2] In early 2015, Detective Melanie Bickford of the Byron Police Department began investigating Captain Jack's following complaints of "illegal gambling." Bickford was assisted by Officer Christine Welch, who worked undercover during the investigation.

Bickford and Welch began their investigation by going to a gas station in another town to teach themselves how to play a COAM machine because neither had ever played before.[3] First, they inserted a twenty dollar bill into the machine, which gave them a certain amount of credits. They were then able to raise or lower how much they wanted to bet on each spin. The display screen had three digital slot-machine type wheels with pictures of fruits or numbers on them. They then hit a "spin

---

[1] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[2] Customers were also allowed to eat and smoke in the game room.

[3] Bickford also watched YouTube videos depicting COAMs.

2

button" and another button to "nudge" the wheels up or down in order to make a winning combination.

After spending less than one hour to become familiar with the machines at the gas station, Welch went to Captain Jack's to play the COAMs there on six different dates in March and April 2015. Her mission was to secretly record portions of her play and attempt to receive cash payouts. On the first occasion, she put thirty dollars into the COAM.[4] After putting in the cash, she chose which game to play and then placed her wager, which had to be between twenty-five cents and five dollars. After spinning the wheels, she had to press a separate button to lower the wheels to make three matches across the middle of the screen. When she finished playing, she hit a button to end the play and then walked to a bar where someone handed her a certificate for the amount of credits she had earned. She then took the certificate to the cash register in the front of the restaurant where she received a two-dollar lottery ticket and the remaining amount in cash.

Welch returned two days later, played sixty dollars, and won one hundred ninety dollars. She was given a forty dollar certificate and a one hundred fifty dollar certificate. When she brought the certificates to the front, she received a two-dollar

---

[4] The State played the video recording of this visit for the jury.

3

Case S20G0008 Filed 08/05/2019 Page 41 of 54

lottery ticket, a five-dollar lottery ticket, and the remainder in cash. The third time, she played sixty dollars and cashed out with forty dollars, again receiving a two-dollar lottery ticket and the remainder in cash. This pattern continued at each of her visits. According to Welch, there were times that she won without having to hit the button to lower or raise the wheels, but she could not recall which of the nine COAMs it had happened on or how many times it had happened. One of the videos she recorded appeared to show another patron playing a COAM where she won without having to nudge the wheels.

On May 5, 2015, Byron police obtained a search warrant for Captain Jack's and Bartlett's personal residence. Five agents from the Georgia Lottery Commission were onsite during the search of Captain Jack's. Police seized the COAMs from Captain Jack's and approximately $24,000 in cash from Bartlett's home. Bartlett was ultimately charged in October 2016 with eight counts, including four counts of racketeering, one count of false writings, one count of commercial gambling, one count of possession of a gambling device, and one count of keeping a gambling place.

At trial, in addition to Welch's testimony regarding the COAM operations, the State presented the testimony of Karen Briscoe, who had frequented Captain Jack's over the years. Briscoe testified that she had played the COAMs and would redeem

4

her winnings for a combination of lottery tickets, meal vouchers, and cash. She also explained that as far as she could recall, she had always moved the wheels up or down in order to win and had never won without having to "nudge" the wheels.

Tony Williams, one of the Georgia Lottery Commission[5] ("GLC") inspectors present when law enforcement executed the search warrant at Captain Jack's, confirmed that Bartlett had a valid location license.[6] He also determined that between October 2013 and May 2015, $1,235,268 in cash was placed in the COAMs at Captain Jack's, and Bartlett reported a net profit of $398,176.[7] Following the

---

[5] The GLC began regulating COAMs in July 2013; prior to that time, COAMs were regulated by the Department of Revenue. Approximately 22,000 COAMs are certified and licensed to operate in Georgia by the GLC. Each machine is connected to a computer that monitors the money going into and out of the machines.

[6] Williams explained that a "master license holder" actually owns the machine whereas a "location license holder" enters into an agreement with a master license holder to use the machine. A single business cannot be both the master license and location license holder. To become a license holder, the business owner must apply to the GLC. The GLC also regulates and licenses the manufacturers of COAMs. Neither the master license holder nor the manufacturer of the COAMs at issue here were cited for any violations.

[7] The difference of $837,092 was the amount of redemption received by the players of the COAMs. The net profit is split, by law, with the master license holder, after the GLC takes five percent the first year, with the percentage to the GLC going up each year thereafter until a cap of ten percent.

5

Case S20G0008 Filed 08/05/2019 Page 43 of 54

inspection undertaken as part of the seizure, it was determined that the COAMs were operating only the appropriate types of games and displayed the required notices.

The State also presented the testimony of Christopher Edwards, an expert in forensic accounting, who testified that after examining Captain Jack's business records, he identified $4,400,000 in cash received via the COAMs from October 2013 through May 2015, with $2,400,000 unaccounted for in the records. He concluded that the COAM redemptions must have been paid out in cash.[8]

The State also introduced evidence of prior transactions through Sergeant Ashley Greer,[9] who testified that in 2010 he had previously investigated Captain Jack's to determine whether it was paying out cash redemptions. Through the use of a confidential informant, Greer determined that Captain Jack's had paid out between fourteen dollars and twenty-nine dollars in cash, along with a small sundry item, on three separate occasions. At the conclusion of his investigation, law enforcement

_____

[8] Edward conceded on cross-examination, however, that he had not taken into consideration certain variables, such as the required split with the master license holder or the "cashless" ATM used in the restaurant. In addition, he included gross receipts from other local businesses owned by Bartlett in reaching his figures but did not use the Bartlett's individual tax returns in doing so.

[9] The trial court first gave a limiting instruction to the jury, explaining that the evidence was to be considered only for the purpose of proving Bartlett's intent.

seized approximately $3,000 in cash from the restaurant's register, but did not seize the COAMs or make any arrests before closing the case.[10]

The defense presented the testimony of several expert witnesses. Nick Farley, who owns one of the three independent testing laboratories used by the GLC, testified as an expert in electronic gaming testing, certification, and compliance. Farley explained that COAMs, by definition, have to have some skill. Before the GLC will consider granting a license, the COAM must be tested and certified by an independent testing laboratory. The testing ensures both that the game requires some skillful action on the part of the player and that it is communicating correctly with the GLC.

In this case, Farley examined the COAMs seized from Captain Jack's and found no evidence of tampering. He also performed an analysis of the software that was used in each of the COAMs. He confirmed that all of the games were "nudge games," meaning a game in which wheels spin and stop on a non-winning combination before the player identifies whether a winning combination is possible by moving one of the available wheels up or down to align the symbols in a winning

_____

[10] A former Captain Jack's employee also testified that when she worked there in 2010, patrons who finished playing a COAM would print a ticket from the machine and bring it to her to get a gift certificate. They would then take the gift certificate to the front register, purchase something like lighters, candy, or food from the restaurant, and then receive the remainder of the certificate amount in cash.

7

pattern. Based on his analysis, none of the COAMs seized allowed for a winning combination without the player making some move to align the symbols.[11] He explained that when Welch thought she had played a winning combination without any further player input, what had actually occurred is that the game offered what is called a "bonus feature," which is presented as a free game or a continuation of play.[12] He was able to discern the "free game" symbol on the video Welch had recorded of her play.

Barlett also called Mark Nizdil to testify as an expert in the gaming industry. He explained that every COAM in the state continuously communicates data to the GLC, including how much money goes into the machine, the amount of plays that are made, and how many prizes are issued. Through his inspection, he determined that the games required some player assistance to make a winning combination. He explained that if anyone had attempted to manipulate the game in any way, the

---

[11] Bartlett also introduced copies of the documents certifying that the machines were bona fide COAMs.

[12] So in a game where the player nudged a symbol into a winning combination, the game will occasionally offer a bonus play and continue the play with no additional cost and then seemingly award a prize without further player interaction.

8

machine would have created a different signature number that would not connect to the GLC's required communication system.[13]

The jury convicted Bartlett of only the three commercial gambling charges. The trial court sentenced Bartlett to a total of five years, with two to be served in confinement. This appeal followed.

1. We turn first to Barlett's assertion that the trial court erred in denying his motion for directed verdict of acquittal on Counts 5, 6, and 7. We review the denial of a motion for a directed verdict of acquittal under the same standard as for determining the sufficiency of the evidence to support a conviction. *Smith v. State*, 304 Ga. 752, 754 (822 SE2d 220) (2018). "The evidence is sufficient as a matter of law if, when viewed in the light most favorable to the verdict, a rational trier of fact could find all the essential elements of the crimes charged beyond a reasonable doubt." (Citation and punctuation omitted.) *Pugh v. State*, 280 Ga. App. 137, 137 (633 SE2d 439) (2006).

---

[13] Bartlett also called John Corn, an expert in state and local taxation, to rebut the State's methodology in determining Captain Jack's accrual of sales and use tax. Corn concluded that Captain Jack's would not be required to accrue and remit to the State use tax resulting from its payment of cash as a redemption for the COAM gift certificates because cash is not tangible personal property.

9

Count 5 of the indictment charged Bartlett with committing the offense of commercial gambling in violation of OCGA § 16-12-22 (a) (1).[14] Count 6 charged Barlett with committing the offense of possession of a gambling device or equipment in violation of OCGA § 16-12-24 (a).[15] Count 7 charged Barlett with committing the offense of keeping a gambling place in violation of OCGA § 16-12-23 (a).[16] The State contended that the machines seized from Captain Jack's are "gambling devices," operated in violation of the commercial gambling statutes. Thus, the pivotal question is whether the seized machines are commercial gambling devices or COAMs.

As previously explained by our Supreme Court, commercial gambling is illegal in Georgia, but "OCGA § 16-12-35 creates an exception to Georgia's criminal laws

---

[14] OCGA § 16-12-22 (a) (1) provides that "[a] person commits the offense of commercial gambling when he intentionally . . . [o]perates or participates in the earnings of a gambling place[.]"

[15] OCGA § 16-12-24 (a) provides that "[a] person who knowingly owns, manufactures, transfers commercially, or possesses any device which he knows is designed for gambling purposes or anything which he knows is designed as a subassembly or essential part of such device is guilty of a misdemeanor of a high and aggravated nature."

[16] OCGA § 16-12-23 (a) provides that "[a] person who knowingly permits any real estate, building, room, tent, vehicle, boat, or other property whatsoever owned by him or under his control to be used as a gambling place or who rents or lets any such property with a view or expectation that it be so used commits the offense of keeping a gambling place."

10

Case S20G0008 Filed 08/05/2019 Page 48 of 54

against gambling for certain coin operated games and other devices designed and manufactured for bona fide amusement purposes only, which are comprehensively regulated by [a separate title of the Georgia Code] in OCGA §§ 50-27-70 to 50-27-104." *Gebrekidan v. City of Clarkston*, 298 Ga. 651, 656 (3) (a) (784 SE2d 373) (2016). OCGA § 50-27-70 (b) (2) (A) defines a bona fide coin operated amusement machine as:

> every machine of any kind or character used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, card, or similar object *and the result of whose operation depends in whole or in part upon the skill of the player*, whether or not it affords an award to a successful play pursuant to subsections (b) through (g) of Code Section 16-12-35, and which can be legally shipped interstate according to federal law.

(emphasis added).

The State's theory at trial was that the COAMs in Captain Jack's were effectively converted into illegal gambling devices for two reasons. First, the State relied upon Welch's testimony that she was able to complete a winning spin without having to nudge the wheels, thus removing the element of player skill required of a bona fide COAM. In addition, the State asserted that because cash payments were

11

given to patrons in exchange for the certificates earned from the COAMs, the COAMs should be treated as illegal gambling devices. Both theories fail.

The State conceded at oral argument that there is no evidence that Bartlett tampered with the COAMs or otherwise did anything to remove the element of player skill. The commercial gambling offenses Bartlett is charged with are not strict liability crimes. Rather, they require that the defendant *intentionally* operate or participate in the earnings of a gambling place (OCGA § 16-12-22 (a) (1)), *knowingly* own or possess a device that he *knows* is designed for gambling purposes (OCGA § 16-12-24 (a)), and *knowingly* permit his property to be used as a gambling place (OCGA § 16-12-23 (a)). Thus, viewing the evidence in the light most favorable to the verdict, the State's evidence, at most, supported that the COAMs malfunctioned in some way to allow Welch to win without "nudging" the wheels. This is insufficient to show that Bartlett acted with the requisite criminal intent to support the commercial gambling charges.

Turning to the issue of whether the cash payments converted the certified COAMs into illegal gambling devices, OCGA § 16-12-35 (e) through (g) expressly governs the consequences for making cash payouts instead of the authorized rewards

listed in OCGA § 16-12-35 (d) (1).[17] See *Gebrekidan*, 298 Ga. at 657 (3) (a) ("It is a crime to misuse COAMs, such as by paying cash for successful plays, and there are numerous penalties for violating other provisions of the complex statutory scheme, such as provisions requiring the filing of reports. See OCGA §§ 16-12-35, 50-27-

---

[17] OCGA § 16-12-35 (d) (1) provides:

Nothing in this part shall apply to a coin operated game or device designed and manufactured only for bona fide amusement purposes which involves some skill in its operation if it rewards the player exclusively with:

(A) Free replays;

(B) Merchandise limited to noncash merchandise, prizes, toys, gift certificates, or novelties, each of which has a wholesale value of not more than $5.00 received for a single play of the game or device;

(C) Points, tokens, vouchers, tickets, or other evidence of winnings which may be exchanged for rewards set out in subparagraph (A) of this paragraph or subparagraph (B) of this paragraph or a combination of rewards set out in subparagraph (A) and subparagraph (B) of this paragraph; or

(D) Any combination of rewards set out in two or more of subparagraph (A), (B), or (C) of this paragraph.

13

85."). And OCGA § 16-12-35 plainly states that the misuse of a COAM by paying cash for winning plays constitutes a misdemeanor:[18]

> (e) Any person who gives to any other person money for free replays on coin operated games or devices described in subsection (b), (c), or (d) of this Code section shall be guilty of a *misdemeanor*.

> (f) Any person owning or possessing an amusement game or device described in subsection (c) or (d) of this Code section or any person employed by or acting on behalf of any such person who gives to any other person money for any noncash merchandise, prize, toy, gift certificate, or novelty received as a reward in playing any such amusement game or device shall be guilty of a *misdemeanor*.

> (g) Any person owning or possessing an amusement game or device described in subsection (b), (c), or (d) of this Code section or any person employed by or acting on behalf of any such person who gives to any other person money as a reward for the successful play or winning of any such amusement game or device shall be guilty of a *misdemeanor* of a high and aggravated nature.

---

[18] A person who violates OCGA § 16-12-35 is also subject to having his or her COAM license revoked. See OCGA § 50-27-73 (c). In addition, OCGA § 16-12-35 (g.1) provides that anyone who commits multiple violations of out-of-store redemptions or redemptions for firearms, alcohol, or tobacco shall be guilty of a felony.

14

(emphasis added). Nowhere in OCGA § 16-12-35 does the General Assembly provide that a cash payout would convert an otherwise legal COAM into an illegal "gambling device" that would have subjected Bartlett to prosecution under OCGA §§ 16-12-22 (a) (1), 16-12-24 (a), or 16-12-23 (a).

Thus, where the State chose not to charge Bartlett with a misdemeanor under OCGA § 16-12-35 (e), (f), or (g), but instead elected to charge him under the commercial gambling statutes that COAMs are specifically exempted from, the evidence was insufficient as a matter of law to convict him of Counts 5, 6, and 7. Because the evidence is insufficient to enable a rational trier of fact to find Bartlett guilty beyond a reasonable doubt of the commercial gambling charges, it follows that the trial court erred in denying Bartlett's motion for a directed verdict of acquittal. See *Everritt v. State*, 277 Ga. 457, 460 (588 SE2d 691) (2003).

2. Based on our holding in Division 1, we need not reach Bartlett's remaining enumerations of error.

*Judgment reversed. McFadden, P. J., and Goss, J., concur.*

15

Case S20G0008   Filed 08/05/2019   Page 53 of 54

# Exhibit B

# Court of Appeals
# of the State of Georgia

ATLANTA, July 15, 2019

*The Court of Appeals hereby passes the following order*

**A19A0426. RONNIE BARTLETT v. THE STATE.**

Upon consideration of the APPELLEE'S Motion for Reconsideration in the above styled case, it is ordered that the motion is hereby DENIED.



*Court of Appeals of the State of Georgia*
*Clerk's Office, Atlanta, July 15, 2019.*

*I certify that the above is a true extract from the minutes of the Court of Appeals of Georgia.*

*Witness my signature and the seal of said court hereto affixed the day and year last above written.*

*Stephen E. Castlen* , *Clerk.*