[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11112

_____

CAPTAIN JACK'S CRAB SHACK, INC.,

d.b.a. Captain Jack's Shack,

RONNIE BARTLETT,

LEE BARTLETT,

Plaintiffs-Appellees,

*versus*

K. DAVID COOKE, JR.,

District Attorney of the Macon Judicial Circuit, in

his individual capacity, et al.,

2                    Opinion of the Court          21-11112, *et al.*

                                                Defendants,


MELANIE BICKFORD,
Investigator, City of Byron Police Department,
Byron, Georgia, in her individual capacity,

                                          Defendant-Appellant.


_____


Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cv-02887-SCJ

_____


_____


No. 21-11114

_____


CAPTAIN JACKS'S CRAB SHACK, INC.,
d.b.a. Captain Jack's Shack,

                                                Plaintiff,


RONNIE BARTLETT,
LEE BARTLETT, et al.,

                                          Plaintiffs-Appellants,

*versus*

K. DAVID COOKE, JR.,
District Attorney of the Macon Judicial Circuit, in
his individual capacity,
MICHAEL G. LAMBROS,
Special Assistant District Attorney of the Macon
Judicial Circuit, in his individual capacity,
MELANIE BICKFORD,
Investigator, City of Byron Police Department,
Byron, Georgia, in her individual capacity,
CHRISTINE WELCH,
Police Officer, City of Centerville Police
Department, Centerville, Georgia, in her individual
capacity,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cv-02887-SCJ

————————————————

4                    Opinion of the Court          21-11112, *et al.*

————————————

No. 21-11113

————————————

CAPTAIN JACKS'S CRAB SHACK, INC.,
d.b.a. Captain Jack's Shack,
RONNIE BARTLETT,
LEE BARTLETT,

                                                        Plaintiffs-Appellees,


*versus*

K. DAVID COOKE, JR.,
District Attorney of the Macon Judicial Circuit, in
his individual capacity, et al.,

                                                        Defendants,


CHRISTINE WELCH,
Police Officer, City of Centerville Police
Department, Centerville, Georgia, in her individual
capacity,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cv-02887-SCJ

_____

Before WILLIAM PRYOR, Chief Judge, LUCK, Circuit Judge, and
MOORER,[*] District Judge.

PER CURIAM:

In 2015, the Byron Police Department launched an investigation into Captain Jack's, a seafood restaurant in Georgia. An undercover officer saw Captain Jack's pay thousands of dollars in cash prizes to those who won on the restaurant's video poker machines. These cash payments violated Georgia law. So the officers searched the property, seized the restaurant's money, and arrested the owners—Ronnie and Lee Bartlett.

The district attorney's office brought Mr. Bartlett to trial and a jury convicted him of several gambling crimes. The Georgia Court of Appeals later reversed the conviction. The Bartletts, in turn, sued two prosecutors and two officers that they say were

_____

[*] The Honorable Terry F. Moorer, United States District Judge for the Southern District of Alabama, sitting by designation.

responsible for the prosecution, asserting twelve federal and state law claims.

The district court granted the prosecutors' motions to dismiss, denied the officers' motions for judgment on the pleadings, and denied the Bartletts' motion for leave to amend their complaint. After careful review, and with the benefit of oral argument, we conclude that the Bartletts' claims are barred by immunity or otherwise fail. We affirm the dismissal of the Bartletts' claims against the prosecutors and the denial of the Bartletts' motion to amend. We reverse the denial of the officers' motions for judgment on the pleadings.

## FACTUAL BACKGROUND[1]

Ronnie and Lee Bartlett, a married couple in their seventies, owned and operated Captain Jack's Crab Shack, a seafood restaurant in Byron, Georgia. Captain Jack's had a state license to use

---

[1] "We accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Luke v. Gulley*, 975 F.3d 1140, 1143 (11th Cir. 2020) (quoting *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019)). We consider Officer Melanie Bickford's affidavit because it was "referred to in the complaint, central to the [plaintiffs'] claim[s], and of undisputed authenticity." *Id.* at 1144 (quoting *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018)). And we take judicial notice of the state court's record in Mr. Bartlett's criminal case (including the directed verdict denial, the jury's guilty verdict, and the reversal on appeal) because those facts are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201(b)(2).

"coin operated amusement machines" at the restaurant. While gambling is generally illegal in Georgia, the state legislature has created an exception for these closely regulated games. *See* GA. CODE ANN. § 16-12-35.

A coin operated amusement machine is any "machine . . . used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of [money or tokens] and the result of whose operation depends in whole or in part upon the skill of the player." GA. CODE ANN. § 50-27-70(b)(2)(A). These games include, for example, pinball machines, video games, and claw machines: games that require at least *some* skill. *Id.* Georgia law allows players who win to redeem "noncash" prizes worth up to five dollars for a single play. § 16-12-35(d)(2). It's a "misdemeanor of a high and aggravated nature" for any person owning a coin operated amusement machine to "give[] to any other person money as a reward for the successful play or winning of any such amusement game." § 16-12-35(g).

On May 1, 2015, Officer Melanie Bickford with the Byron Police Department signed an affidavit in support of search and arrest warrants for Captain Jack's and the Bartletts. In her affidavit, Officer Bickford averred that an undercover officer, Christine Welch, went to Captain Jack's five times. While Officer Welch was there, she played the games. And, during those visits, Officer Welch was paid $330 in cash out of Captain Jack's register for winning on "video poker" machines. Officer Welch also saw a woman

win $2,500 and watched Mr. Bartlett remove money from the games to gather enough cash to pay the woman.

On May 5, 2015, the Byron Police Department executed the warrants it secured based on Officer Bickford's affidavit. While executing the warrants, the officers "confiscated [Captain Jack's games] and cash and other personal property." They also arrested the Bartletts. On that same day, District Attorney David Cooke and Special Assistant District Attorney Michael Lambros—both with the district attorney's office for the Macon Judicial Circuit—filed a civil case against the Bartletts in state court under Georgia's Racketeer Influenced and Corrupt Organizations Act. The state court entered a temporary restraining order "freezing [the Bartletts'] accounts and assets."

The Bartletts allege that this "illegal raid" was "secured by . . . fabricated evidence." The search, arrest, and civil racketeering case, they say, hinged on four flawed allegations: that the Bartletts were (1) "making cash payments to players of the illegal gambling machines," (2) "operating illegal gambling machines" by using machines that "allowed a 'win' without any skill or assistance of the player," (3) "falsely report[ing] winnings to the Georgia Department of Revenue," and (4) "engag[ing] in money laundering." The defendants "knew they had no evidence of any of [these] acts," the Bartletts claim. For example, there was no evidence that the Bartletts *personally* made any cash payments.

According to the Bartletts, Officer Bickford and Officer Welch's "perjured testimony led to the raid on Captain Jack's, the

21-11112, *et al.*         Opinion of the Court                    9

arrests of the Bartletts, and the filing of the civil [racketeering] ac-
tion." And the officers did "[a]ll of this"—i.e., they conducted the
search and arrest based on "fabricated evidence" in the affidavits—
"at the insistence of . . . Lambros and Cooke." District Attorney
Cooke and Special Assistant District Attorney Lambros also "di-
rected" the "illegal raid" on Captain Jack's.

The Bartletts claim that this wasn't the first time that District
Attorney Cooke and Special Assistant District Attorney Lambros
pursued unsupported actions against businessowners. The prose-
cutors allegedly had "a pattern and practice of . . . seiz[ing] all the
assets of locations operating bona fide coin operated amusement
machines" and then "extort[ing] a resolution with the location
owners that allow[ed] [the prosecutors] to keep a portion of the
money improperly seized, while threatening location owners with
criminal prosecution." And District Attorney Cooke allegedly
"create[d] an unaccountable fund with the revenues generated
from these improper seizures, minus the monies paid to . . . Lam-
bros, and then spen[t] the[] [funds] . . . on items he believe[d]
[would] garner him favor with his constituency."

That, the Bartletts say, is what happened here. In August
2016, more than a year after the prosecutors filed the civil racket-
eering case, they dropped the case. But by that time, the Bartletts
had hired two experts who both determined that Captain Jack's
games were legal because they required skill. And when the Bart-
letts sent a notice of their intent to sue, District Attorney Cooke
told the Bartletts that "he had not been planning to prosecute"

them but that "receiving the [n]otice had caused him to reconsider
and prioritize their case for prosecution."  Seventeen months after
their initial arrests, the Bartletts were indicted for several gambling
crimes.  They both were arrested and placed in jail overnight be-
fore they posted bond.

In February 2018, Mr. Bartlett's criminal case finally went to
trial.[2]  Once the government finished presenting its case, Mr. Bart-
lett moved for a directed verdict, arguing that the games at Captain
Jack's fell outside the gambling laws.  The government disagreed,
contending: (1) "[o]nce you start paying out cash you have turned
that [otherwise-exempt game] into a gambling device"; and (2) the
games were gambling devices because Officer Welch had testified
that there were "times where [she] w[o]n" without giving the
games a "nudge" (i.e., she won with no skill).  The trial court de-
nied Mr. Bartlett's motion for a directed verdict.  And the jury con-
victed Mr. Bartlett on three counts:  commercial gambling, pos-
sessing gambling equipment, and keeping a gambling place.  The
jury acquitted Mr. Bartlett on several criminal racketeering
charges.

Mr. Bartlett appealed, and the Georgia Court of Appeals re-
versed, finding that "the evidence was insufficient as a matter of
law to support his convictions."  *Bartlett v. State*, 829 S.E.2d 187,

_____

[2] Mrs. Bartlett was never tried, and the charges against her were dismissed.

188 (Ga. Ct. App. 2019).  The state court of appeals explained the government's theory:

> The [s]tate's theory at trial was that the [games] in Captain Jack's were effectively converted into illegal gambling devices for two reasons.  First, the [s]tate relied upon [Officer] Welch's testimony that she was able to complete a winning spin without having to nudge the wheels, thus removing the element of player skill required of a bona fide [coin operated amusement machine].  [Second], the [s]tate asserted that because cash payments were given to patrons in exchange for the certificates earned from the [games], the [games] should be treated as illegal gambling devices.

*Id.* at 191–92.

The state court of appeals rejected both reasons.  *Id.* at 192. As to the first, it found that there was no evidence that Mr. Bartlett *knew* that the games allowed a player to win without skill.  *Id.* "[A]t most," the court said, the evidence "supported that the [games] malfunctioned in some way to allow [Officer] Welch to win without 'nudging' the wheels."  *Id.*  As to the second, the state court of appeals rejected the government's contention that the cash payments could transform the games into illegal gambling devices. *Id.* at 192–93.  Instead, section 16-12-35 "states that the misuse of a [coin operated amusement machine] by paying cash for winning plays constitutes a misdemeanor."  *Id.* at 192.  "Nowhere in [section] 16-12-35 does the General Assembly provide that a cash

12                    Opinion of the Court               21-11112, *et al.*

payout would convert an otherwise legal [game] into an illegal
'gambling device' that would have subjected Bartlett to prosecu-
tion under" the criminal provisions he was charged under.  *Id.* at
192–93.  For these reasons, the state court of appeals reversed Mr.
Bartlett's conviction.  *Id.* at 193.

## PROCEDURAL HISTORY

The Bartletts filed this case six years ago, on August 9, 2016,
against District Attorney Cooke, Special Assistant District Attorney
Lambros, Officer Bickford, and Officer Welch.[3]  One month after
the case was filed, the defendants moved to stay it, arguing that the
district court should abstain from interfering with the state crimi-
nal proceedings.  The Bartletts, in turn, filed a motion for a tempo-
rary restraining order, seeking to enjoin the state criminal proceed-
ings.  The Bartletts also filed an amended complaint.  In April 2017,
the district court ruled on the motions, granting a stay and denying
the temporary restraining order and preliminary injunction.

Months later, the Bartletts moved to reopen the case and to
file a second amended complaint.  The district court granted that
motion.  It noted that "[m]ore than six months ha[d] passed since
[the district court stayed the case], and nearly two-and-a-half years
ha[d] passed since the Bartletts were first arrested," and yet there
was "no indication that the criminal prosecutions ha[d] concluded

---

[3] Captain Jack's was also a plaintiff.  The district court dismissed Captain Jack's
from this case for lack of standing, and the business didn't appeal that ruling.

21-11112, *et al.*          Opinion of the Court          13

or [were] anywhere near concluding."   The district court also found "good cause for amending."

On November 1, 2017, the Bartletts filed their operative second amended complaint.  They brought twelve counts:  (1) a due process claim under 42 U.S.C. § 1983; (2) an unlawful search claim under § 1983; (3) a speech retaliation claim under § 1983 against the prosecutors; (4) a failure to intervene claim under § 1983 against the prosecutors; (5) a conspiracy claim under 42 U.S.C. § 1985; (6) a claim for attorneys' fees under 42 U.S.C. § 1988; (7) an intentional infliction of emotional distress claim; (8) a conversion claim; (9) a punitive damages claim; (10) an injunctive relief claim against the prosecutors; (11) an abusive litigation claim against the prosecutors; and (12) a claim for attorneys' fees under GA. CODE ANN. § 13-6-11.

As the parallel criminal case approached trial, the district court stayed the case again.  It lifted the stay more than two years later, on May 15, 2020.  After that, the defendants filed separate dispositive motions.  District Attorney Cooke and Special Assistant District Attorney Lambros each moved to dismiss.  Officers Bickford and Welch each moved for judgment on the pleadings.  In response, the Bartletts moved to file a third amended complaint.  The district court entered five separate orders disposing of these five separate motions.  These are the five orders on appeal.

The district court granted the prosecutors' motions to dismiss for three reasons:  First, the Bartletts offered no more than "conclusory" and "speculative" allegations that the prosecutors

"fabricated" evidence and "knew" they were pursuing false charges.  Second, the prosecutors were absolutely immune for their role in "initiating and pursuing criminal prosecution."  And third, the prosecutors were entitled to qualified immunity because it was not clearly established that "the underlying cases against [the Bartletts] would not succeed."

The district court denied the officers' motions for judgment on the pleadings.  As to the federal claims, the district court concluded that the officers weren't entitled to qualified immunity because they "knew that [the Bartletts'] machines were not illegal and yet lied about that fact . . . to help achieve probable cause."  As to the state law claims, the district court concluded that the officers weren't entitled to official immunity because the Bartletts adequately alleged that the officers acted "malicious[ly] and without probable cause."

The district court denied the Bartletts' motion to amend. The Bartletts moved to add two claims, both under § 1983: one for malicious prosecution and one for excessive fines.  First, the district court found that the Bartletts' attempt to add an excessive fines claim was "unduly delayed."  Second, the district court found that both claims would fail and so the amendment was futile.  As to the malicious prosecution claim, the district court concluded that the prosecutors enjoyed absolute immunity because their actions were "intimately associated with the judicial phase of the criminal process."  And the officers were entitled to qualified immunity because "there was probable cause" as shown by the jury's guilty verdict

21-11112, *et al.*        Opinion of the Court              15

and the lack of plausible allegations that they "concocted false evidence." As to the excessive fines claim, the district court concluded that all of the defendants were entitled to qualified immunity because the Supreme Court didn't hold that the excessive fines clause applied to state actors until after the seizures in 2015.

The officers filed a notice of appeal challenging the district court's order denying them qualified immunity. The Bartletts filed a notice of appeal challenging the district court's orders (1) dismissing their claims against the prosecutors and (2) denying leave to amend. At oral argument, the Bartletts conceded that their due process, speech retaliation, and conspiracy claims (counts one, three, and five) are barred by immunity or fail to state a claim. As a result, we will not consider those claims here. *See RES-GA Cobblestone, LLC v. Blake Constr. & Dev., LLC*, 718 F.3d 1308, 1313 n.6 (11th Cir. 2013) ("[A] party is bound by unambiguous concessions or waivers made at oral argument[.]").

## STANDARDS OF REVIEW

We review de novo the district court's ruling on a motion to dismiss and a motion for judgment on the pleadings. *Davis v. Carter*, 555 F.3d 979, 981 (11th Cir. 2009) (motion to dismiss); *Mergens v. Dreyfoos*, 166 F.3d 1114, 1116 (11th Cir. 1999) (motion for judgment on the pleadings). We also review de novo a district court's decision on "qualified or absolute immunity." *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001).

16                    Opinion of the Court            21-11112, *et al.*

"A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss" for failure to state a claim. *Samara v. Taylor*, 38 F.4th 141, 152 (11th Cir. 2022) (quoting *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018)). The "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

We generally review a district court's order on a motion to amend for abuse of discretion. *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1291 (11th Cir. 2007). But we review questions of law raised by a motion to amend—like whether an amendment is futile—de novo. *Fla. Evergreen Foliage v. E.I. DuPont De Nemours & Co.*, 470 F.3d 1036, 1040 (11th Cir. 2006) ("[W]hen the district court denies the plaintiff leave to amend due to futility, we review the denial de novo[.]" (*quoting Freeman v. First Union Nat'l*, 329 F.3d 1231, 1234 (11th Circ. 2003)).

## DISCUSSION

Our analysis proceeds in three steps. First, we review the federal claims for unlawful search and failure to intervene. Second, we turn to the state law claims for intentional infliction of emotion distress, conversion, and abusive litigation. And third, we discuss the motion to amend. As we'll explain, the Bartletts' claims are barred by immunity and fail to state plausible claims for relief.

21-11112, *et al.*          Opinion of the Court          17

### Unlawful Search (Count Two)

The Bartletts asserted an unlawful search claim against the defendants.  This claim fails for two reasons.  First, the prosecutors are entitled to absolute immunity because the Bartletts failed to plausibly allege that the prosecutors acted outside the judicial process.  Second, the defendants are entitled to qualified immunity because the search warrant affidavit supplied at least arguable probable cause for the search.

### Absolute Immunity

While "[s]ection 1983, on its face[,] admits of no defense of official immunity," the Supreme Court has held that certain common law "immunities were so well established in 1871, when § 1983 was enacted, that 'we presume that Congress would have specifically so provided had it wished to abolish' them."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (quoting *Pierson v. Ray*, 386 U.S. 547, 554–55 (1967)).  This presumption reflects the principle that "Congress legislates against a background of common-law adjudicatory principles, and it expects those principles to apply except when a statutory purpose to the contrary is evident."  *Minerva Surgical, Inc. v. Hologic, Inc.*, 141 S. Ct. 2298, 2307 (2021) (cleaned up).  So, for the most part, the immunities that existed at common law carry over to § 1983.  *See Rehberg v. Paulk*, 566 U.S. 356, 364 (2012) (noting that immunity is "tied to the common law[]" but that the Court has not "mechanically duplicated the precise scope of the absolute immunity that the common law provided").

18               Opinion of the Court          21-11112, *et al.*

There are two types of immunities: absolute and qualified. *Buckley*, 509 U.S. at 268–69. "In determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, we have applied a functional approach . . . ." *Id.* at 269 (quotation omitted). As relevant here, the Supreme Court has applied this functional approach to prosecutors, holding that prosecutors are entitled to absolute immunity for conduct that is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). On the other hand, absolute immunity may not apply "when a prosecutor is not acting as an officer of the court, but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (quotation omitted).

Over time, the Supreme Court has helped define the border between the judicial phase of the criminal process and investigative tasks. It's held, for example, that absolute immunity applies to a prosecutor's actions "in initiating a prosecution and in presenting the [s]tate's case." *Imbler*, 424 U.S. at 431. So, in *Imbler*, the prosecutor was absolutely immune where he allowed a witness to give false testimony at trial and introduced into evidence a sketch altered to resemble the defendant. *Id.* at 416. Prosecutors also enjoy absolute immunity for their courtroom advocacy—like "appearing before a judge and presenting evidence in support of a motion for a search warrant." *Burns v. Reed*, 500 U.S. 478, 491 (1991); *see also Hart v. Hodges*, 587 F.3d 1288, 1295 (11th Cir. 2009) ("Prosecutors

21-11112, *et al.*          Opinion of the Court                    19

are immune for appearances before a court and conduct in the courtroom, including examining witnesses and presenting evidence in support of a search warrant during a probable cause hearing."). "A prosecutor," in short, "enjoys absolute immunity from allegations stemming from the prosecutor's function as advocate." *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999).

But "prosecutorial immunity does not apply when the prosecutor acts outside the . . . activities 'intimately associated' with the judicial process." *Hart*, 587 F.3d at 1296. There was no absolute immunity, for example, when a prosecutor advised officers (during their investigation) that "statements that [the suspect] had made while under hypnosis . . . probably [supplied] probable cause to arrest [the suspect]." *Burns*, 500 U.S. at 481–82, 496 (quotation omitted). The Court reasoned that "advising the police in the investigative phase of a criminal case" was not "so intimately associated with the judicial phase of the criminal process" that it "qualifie[d] for absolute immunity." *Id.* at 493 (quotation omitted). Nor was there prosecutorial immunity where a prosecutor "fabricated false evidence" by "shopp[ing] for experts until they found one who would provide the opinion they sought" linking a bootprint from a murder scene to a suspect. *Buckley*, 509 U.S. at 262, 272–74. That prosecutor was acting more as "a detective or police officer," and there was no "authority that support[ed] an argument that a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime was immune from liability at common law." *Id.* at 273–75. And, where a prosecutor personally

20                    Opinion of the Court              21-11112, *et al.*

certified in a sworn affidavit in support of an arrest warrant that
there was probable cause for the arrest, "the only function that she
perform[ed] in giving sworn testimony [was] that of a witness." *Ka-
lina v. Fletcher*, 522 U.S. 118, 121, 131 (1997).  Absolute immunity
did not attach.  *See id.* at 131.

      In our case, the Bartletts have failed to plausibly allege that
the prosecutors acted outside the judicial phase of the criminal pro-
cess.  The Bartletts mainly allege that District Attorney Cooke and
Special Assistant District Attorney Lambros "caused searches of
[their] home [and] business" by "securing judicial approval" of a
search warrant "based on . . . false statements" in a "warrant affida-
vit."  The problem is that "[t]he prosecutor[s'] actions at issue
here—appearing before a judge and presenting evidence in support
of a motion for a search warrant—clearly involve [their] role as ad-
vocate[s] for the [s]tate, rather than [their] role as administrator[s]
or investigative officer[s]." *Burns*, 500 U.S. at 491 (quotation omit-
ted); *see also Kalina*, 522 U.S. at 130 (stating that a prosecutor is
absolutely immune for his "presentation of . . . [a] motion [for an
arrest warrant] to the court").

      Looking to plead their way around this, the Bartletts pointed
to certain "investigative" conduct in their complaint.  The Bartletts
alleged, for example, that the prosecutors "directed an illegal raid,"
"insist[ed]" that the officers include the "fabricated evidence" in the
warrant affidavit, and acted in their "investigative capacities."  But
the Bartletts failed to include "enough facts" to "plausibl[y]" allege
that the prosecutors directed the search, fabricated evidence, or

acted in an investigative capacity. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007).  For example, they don't tell us how the prosecutors "directed" any search, what the prosecutors did to "insist[]" on any false statements, or how they were acting in their "investigative capacities."  After *Twombly* and *Iqbal*, we do not credit "[c]onclusory allegations, unwarranted deductions of facts[,] or legal conclusions masquerading as facts." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004) (quotation omitted).

Against all this, the Bartletts raise three arguments—all unpersuasive.  First, the Bartletts argue that the prosecutors aren't entitled to absolute immunity for directing a search, advising the police in their investigation, or fabricating evidence.  But the Bartletts failed to offer facts to support a reasonable inference that the prosecutors did any of those things.  Indeed, the Bartletts concede that they "do not yet have additional evidence directly showing [that the prosecutors] guided and advised [the officers] in the investigation of Captain Jack's and the drafting of the false affidavits."  And they claim that they might have unearthed this evidence had the prosecutors complied with their discovery obligations in the civil racketeering case.  But the Bartletts cite no authority for the proposition that the need for discovery excuses a plaintiff's failure to plead a plausible claim.  Nor could they.  *See United States v. Cuya*, 964 F.3d 969, 973 (11th Cir. 2020) ("In fact, in civil cases generally, a party is not entitled to discovery before an action is brought—indeed, he may not seek discovery until after he has not only filed a complaint, but a well-pleaded one.").

22                    Opinion of the Court            21-11112, *et al.*

Second, the Bartletts contend that their unlawful search claim looks a lot like the one in *Rieves v. Town of Smyrna*, 959 F.3d 678 (6th Cir. 2020), where the Sixth Circuit held that the district court properly denied prosecutorial immunity. But in that case the plaintiffs had offered "very specific factual allegations that [the prosecutors] acted outside their role as judicial advocates during the investigative phase" of the prosecution into stores selling cannabidiol-infused candy products. *Id.* at 690. For example, the *Rieves* plaintiffs described—in detail—a series of calls and meetings in which the prosecutors repeatedly "assured the officers [that cannabidiol] was an illegal Schedule VI product and that it needed to be prosecuted." *Id.* at 686 (cleaned up). The *Rieves* plaintiffs also pointed to the prosecutors' substantial investigative role in that case, alleging that the prosecutors told an officer to "get a certain detective 'more involved' in the investigation," directed the officers to "speed up the investigation," and "recommended padlocking the businesses." *Id.* at 686–88. There are no similar allegations about legal advice or investigative conduct here. While the Bartletts claim *in their brief* that the prosecutors offered "legal advice" to the officers during the investigation, the complaint said nothing about legal advice. And while the Bartletts did allege in their complaint that the prosecutors "directed an illegal raid," they offered no factual content to support that allegation.

Third, the Bartletts—relying on *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980)—argue that the prosecutors are not entitled to absolute immunity because their decisions were tainted by improper

21-11112, *et al.*          Opinion of the Court                    23

personal and financial motives. *See id.* at 249–50 (observing that a "scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions"). But *Marshall* wasn't an immunity case. While a prosecutor's motives may be relevant to whether a civil rights plaintiff has stated a claim, they are not relevant to determining whether absolute immunity applies. As the Supreme Court explained in *Imbler*, absolute immunity hinges on the "functional nature of the [prosecutor's] activities," not on their personal motivations, and so prosecutors may be immune even when their actions are "malicious or dishonest." *Imbler*, 424 U.S. at 427, 430; *see also Kulwicki v. Dawson*, 969 F.2d 1454, 1464 (3d Cir. 1992) ("Consideration of personal motives is directly at odds with the Supreme Court's simple functional analysis of prosecutorial immunity[.]"); *Brummett v. Camble*, 946 F.2d 1178, 1181 (5th Cir. 1991) (holding that prosecutors are entitled to absolute immunity even if they have a "personal interest in filing charges" because "absolute immunity is justified and defined by the governmental functions it protects and serves, not by the motives with which a particular officer performs those functions").

In sum: District Attorney Cooke and Special Assistant District Attorney Lambros are entitled to absolute immunity for presenting evidence to a judicial officer to obtain a search warrant.

<u>Qualified Immunity</u>

In any event, all the defendants are entitled to qualified immunity for the Bartletts' unlawful search claim. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citation and quotation omitted).

To qualify for the immunity, an official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1143–44 (11th Cir. 2017) (quotation omitted). Here, there is no dispute that the defendants were acting within their discretionary authority when they investigated and prosecuted the Bartletts.

Where, as here, the defendants were acting within their discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. "To meet [that] burden, a plaintiff must show both (1) that [he] suffered a violation of a constitutional right and (2) that the right [he] claims

21-11112, *et al.*          Opinion of the Court          25

was clearly established at the time of the alleged misconduct."
*Huebner v. Bradshaw*, 935 F.3d 1183, 1187 (11th Cir. 2019) (quota-
tion omitted). The federal courts are "permitted to exercise their
sound discretion in deciding which of the two prongs of the quali-
fied immunity analysis should be addressed first in light of the cir-
cumstances in the particular case at hand." *Pearson v. Callahan*,
555 U.S. 223, 236 (2009).

For a right to be clearly established, it must be "clear to a
reasonable officer that his conduct was unlawful in the situation he
confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). We've iden-
tified three ways for the law to be clearly established:

> First, the plaintiffs may show that a materially similar
> case has already been decided. Second, the plaintiffs
> can point to a broader, clearly established principle
> that should control the novel facts of the situation. Fi-
> nally, the conduct involved in the case may so obvi-
> ously violate the constitution that prior case law is un-
> necessary.

*Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012) (cleaned up).
In assessing whether the law is clearly established, we look to the
law as it was interpreted at the time of the challenged conduct by
the United States Supreme Court, the Eleventh Circuit, and the
Georgia Supreme Court. *See id.*

Which takes us to our case—and the Bartletts' claim that the
prosecutors and the officers conspired to include false statements
in the warrant affidavit. The Fourth Amendment provides that "no

[w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation." U.S. CONST. AMEND. IV. The Supreme Court has held that an officer violates this provision by submitting a warrant affidavit with falsehoods that were made "deliberate[ly]" or in "reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *see also Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003) (noting that an "officer may be held liable under 42 U.S.C. § 1983 for submitting an application for an arrest warrant that contains false information").

We analyze a *Franks* claim in two steps. First, "we ask whether there was an intentional or reckless misstatement." *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019). Second, "we examine the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed." *Id.* Probable cause to search exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir. 2013) (quotation omitted). Even "arguable probable cause" is enough to show entitlement to qualified immunity. *See Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).

Applying the *Franks* framework, we must first identify all "deliberate falsehood[s]" and any statements made in "reckless disregard for the truth." 438 U.S. at 171. The Bartletts alleged that Officer Bickford's warrant affidavit contained four misstatements: (1) that the Bartletts personally made "cash payments to players of the illegal gambling machines," (2) that their games were illegal

21-11112, *et al.*          Opinion of the Court                    27

because the games "allowed a 'win' without any skill," (3) that the
Bartletts "falsely reported winnings to the Georgia Department of
Revenue," and (4) that the Bartletts "engaged in money launder-
ing." According to the Bartletts, the defendants "knew they had no
evidence of any of [these] acts."

Turning to *Franks*'s second step, we must "examine the ma-
teriality of the information by inquiring whether probable cause
would be negated if the offending statement was removed." *Paez*,
915 F.3d at 1287. Probable cause for *any* offense alleged in the
search warrant affidavit will preclude a *Franks* claim. *See Madi-
wale*, 117 F.3d at 1327 (holding that an officer was entitled to qual-
ified immunity on a *Franks* claim where there was probable cause
for some, but not all, of the offenses outlined in the search warrant
affidavit). In this case, the affidavit alleged three crimes: commer-
cial gambling, keeping a gambling place, and making cash pay-
ments to those who win on coin operated amusement machines.

Because there was plainly probable cause for the third of-
fense—the cash payments—we don't need to consider the other
two. For this third offense, the search warrant affidavit averred:

> "[B]ona fide" coin operated amusement machines
> [that] reward the player with a cash payout . . . vio-
> lat[e] . . . the redemption paragraph of [section] 16-12-
> 35(d)(l)(B) that states, "rewards . . . exclusively with
> merchandise [that is] limited to non-cash merchan-
> dise, prizes, toys, gift certificates, or novelties, each of
> which has a wholesale value of not more than [five

dollars] received for a single play of the game or de-
vice."

That same statute makes it a "misdemeanor of a high and aggra-
vated nature" for "[a]ny person owning or possessing an amuse-
ment game . . . or any person employed by or acting on behalf of
any such person [to] give[] to any other person money as a reward
for the successful play or winning of any such amusement game."
GA. CODE ANN. § 16-12-35(g).

The affidavit in this case—even taking away the alleged mis-
statements—says enough to provide probable cause for the search.
The affidavit alleged that Officer Welch went to Captain Jack's five
times and that Captain Jack's paid Officer Welch $330 in cash for
winning on video poker machines. The affidavit also reported that
Officer Welch saw a woman win $2,500 and watched Mr. Bartlett
personally remove money from the machines to gather enough
cash to pay the woman. The Bartletts—without ever denying that
the employees at Captain Jack's paid out cash prizes—alleged that
neither of the Bartletts *personally* made any cash payments.[4] Re-
moving that allegation, we're still left with a series of cash pay-
ments out of the register at Captain Jack's to customers who won

---

[4] This reading of the complaint—that the Bartletts only deny that they person-
ally paid the cash—follows from the Bartletts' brief, in which they repeatedly
say only that neither "Mr. nor Mrs. Bartlett ever made any cash payout." It
also follows from the Bartletts' acknowledgement at oral argument that "there
were cash payouts at the store."

21-11112, *et al.*         Opinion of the Court                    29

on the restaurant's video poker machines.  That was enough to supply arguable probable cause to search Captain Jack's for evidence of the cash payments.  *See Madiwale*, 117 F.3d at 1327 (holding that the defendant was "entitled to qualified immunity as to the search warrant claims" because the facts were "adequate to establish arguable probable cause" as to some offenses in the affidavit).

The Bartletts' only contention is that there is no evidence that they *personally* paid out any cash for gambling.  But the test for probable cause for a search warrant is not whether a particular individual committed any crime.  Instead, it's whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Feliciano*, 707 F.3d at 1251 (quoting *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc)).  And, so, even if the officers never witnessed the Bartletts *themselves* pay cash, that doesn't mean there wasn't probable cause to believe that there was evidence of illegal payouts at Captain Jack's.  Instead, Officer Welch's undisputed testimony that she witnessed illegal cash payments at Captain Jack's—the Bartletts' business—created a "fair probability" that there would be evidence of the offense in the Bartletts' "home, business, files, records, electronic devices, and . . . coin operated amusement machines."  Because there was probable cause, even without the alleged misstatements, there was no violation of the Bartletts' Fourth Amendment rights under *Franks*.

30          Opinion of the Court          21-11112, *et al.*

*Failure to Intervene (Count Four)*

The Bartletts brought a failure to intervene claim against the prosecutors, alleging that they are liable because they "did nothing to prevent" the officers from investigating the Bartletts, drafting the false affidavit, or conducting the search. We affirm the district court's dismissal of the Bartletts' failure to intervene claim for two reasons.

First, the Bartletts, in their opening brief, failed to challenge the district court's dismissal of this claim. Instead, the Bartletts addressed the claim for the first time in reply. "Those arguments [came] too late." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014); *see also United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) (noting that the "failure to raise an issue in an initial brief on direct appeal should be treated as a forfeiture of the issue, and [that] the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances").[5]

Second, the Bartletts' failure to intervene claim fails because the prosecutors are shielded by qualified immunity. To overcome qualified immunity, a plaintiff must show that the right he relies on "was clearly established at the time of the alleged misconduct." *Huebner*, 935 F.3d at 1187 (quotation omitted). But, here, the Bartletts have pointed to *no* clearly established law holding that a prosecutor violates the Constitution by failing to intervene in a police

_____

[5] No extraordinary circumstances are presented here.

21-11112, *et al.*          Opinion of the Court                    31

officer's investigation.  In fact, we've held that prosecutors *were* entitled to qualified immunity in a case that's almost identical to this one, where the claim was that the prosecutor was "aware that others were tampering with evidence and t[ook] no action to stop them."  *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1281 (11th Cir. 2002).  We explained that there was no clearly established law requiring a prosecutor to stop an officer from fabricating evidence:

> [The plaintiff] does not cite any decisions, and we are not aware of any, clearly establishing that a prosecutor's mere awareness of (as opposed to participation in) evidence fabrication or tampering violates the federal rights of a criminal defendant.  To the contrary, in an analogous context, this [c]ourt has held that a police officer did *not* violate clearly established law merely by failing to act in the face of knowledge that another officer had fabricated a confession. *Jones*, 174 F.3d at 1286.  Therefore, [the prosecutor] is entitled to qualified immunity for the actions he personally . . . failed to take while in the investigator's role.

*Id.*  Nothing has changed since *Rowe*.  There's no law that clearly established that the prosecutors had to interfere in the officers' investigation.

To this point, the Bartletts (in their reply) cite some of our decisions on supervisory liability, which hold that a supervisory officer may be liable for a subordinate's actions.  *See, e.g.*, *Keating v. City of Miami*, 598 F.3d 753, 765 (11th Cir. 2010) ("A failure to stop claim under a theory of supervisory liability only requires that the

32                    Opinion of the Court              21-11112, *et al.*

supervisor (1) have the ability to prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the constitutional violation, and (2) subsequently fails to exercise that authority to stop it."). But supervisory liability does not help the Bartletts because District Attorney Cooke and Special Assistant District Attorney Lambros "w[ere] not [the officers'] supervisor[s] or even in [the officers'] chain of command." *See Brown v. City of Huntsville*, 608 F.3d 724, 737 (11th Cir. 2010). Since District Attorney Cooke and Special Assistant District Attorney Lambros were not the officers' supervisors, they cannot be held liable as the officers' supervisors.

In short, the Bartletts' failure to intervene claim fails because the Bartletts have abandoned the claim and because the prosecutors are entitled to qualified immunity.

### *Intentional Infliction of Emotional Distress (Count Seven)*

That takes us to the Bartletts' state law claims, starting with intentional infliction of emotional distress.[6] The Bartletts alleged that the defendants are liable for intentional infliction of emotional distress because they "orchestrate[d] . . . illegal arrests of the Bartletts and seizures of [their] property . . . based on knowingly false charges." This claim fails for two reasons. First, the prosecutors are entitled to prosecutorial immunity for obtaining search and

---

[6] The Bartletts are no longer pursuing their state law claims against District Attorney Cooke, having explicitly waived them below and having failed to address them on appeal.

Case 1:16-cv-02887-SCJ   Document 236   Filed 09/22/22   Page 33 of 48
USCA11 Case: 21-11112   Date Filed: 09/22/2022   Page: 33 of 46

arrest warrants. Second, the defendants had probable cause to search and arrest the Bartletts—and so there was nothing "outrageous" about the defendants' conduct.

## Absolute Immunity

Under Georgia law, a prosecutor is entitled to absolute immunity "provided that his acts are within the scope of his jurisdiction." *Holsey v. Hind*, 377 S.E.2d 200, 201 (Ga. Ct. App. 1988) (quotation and emphasis omitted); *see also* GA. CONST. art. VI, § 8, ¶ I(e) ("District attorneys shall enjoy immunity from private suit for actions arising from the performance of their duties."). But "[n]ot all actions undertaken by the [prosecutor] in carrying out the functions of his office are considered within the scope of his jurisdiction as the prosecuting officer of the court." *Holsey*, 377 S.E.2d at 201 (quotation omitted). Instead, we must ask whether the "act or omission is intimately associated with the judicial phase of the criminal process." *Id.* (quotation omitted); *see also Robbins v. Lanier*, 402 S.E.2d 342, 344 (Ga. Ct. App. 1991) (affording prosecutorial immunity because "a prosecutor's decision to file formal criminal charges against an individual is an act intimately associated with the judicial phase of the criminal process").

The Bartletts alleged that the prosecutors "conspired to orchestrate the illegal arrests of the Bartletts and seizures of [their] property." But the only *facts* the Bartletts have offered to support their intentional infliction of emotional distress claim involve the prosecutors "secur[ing] warrants and injunctions." Those actions—moving for warrants and injunctions—are "intimately

associated with the judicial phase of the [litigative] process." *Robbins*, 402 S.E.2d at 344; *see Kalina*, 522 U.S. at 129 (noting that it was "quite clear that [the prosecutor's] activities in . . . filing . . . [a] motion for an arrest warrant" were "protected by absolute immunity"). And the Bartletts' conclusory allegation that the prosecutors "conspired" to secure the warrants isn't enough. *Cf. Rowe*, 279 F.3d at 1282 ("It would be cold comfort for a prosecutor to know that he is absolutely immune from direct liability for actions taken as prosecutor, if those same actions could be used to prove him liable on a conspiracy theory involving conduct for which he was not immune.").

The Bartletts now assert that the prosecutors "guided and advised [the officers] in their investigation of Captain Jack's and the Bartletts, and that [they] knew the falsity of the statements as to probable cause in the warrant affidavits [they] assisted in drafting." But the Bartletts never alleged in their complaint that the prosecutors "guided and advised" the officers during the investigation. Nor did they plausibly allege that the prosecutors "assisted in drafting" the affidavit. Thus, the prosecutors are shielded by state absolute immunity on the intentional infliction of emotional distress claim.

<u>Probable Cause</u>

Under Georgia law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Yarbray v. S. Bell Tel. & Tel. Co.*, 409 S.E.2d 835, 837 (Ga. 1991) (quoting Restatement (Second) of Torts § 46(1) (Am. L. Inst. 1965)). To

21-11112, *et al.*          Opinion of the Court          35

state a claim for intentional infliction of emotional distress, "[t]he conduct complained of must [be] extreme and outrageous." *Id.* (quoting Restatement (Second) of Torts § 46(1) cmt. d).

Georgia courts have held that, where an intentional infliction of emotional distress claim is based on an unlawful search or arrest, probable cause will usually negate any possibility that the conduct was outrageous—thus precluding the claim. *See, e.g.*, *Desmond v. Troncalli Mitsubishi*, 532 S.E.2d 463, 468 (Ga. Ct. App. 2000) ("Because a magistrate found that [the defendant] had probable cause to prosecute [the plaintiff], the filing of charges against [the plaintiff] cannot serve as the basis for his claim."); *Biven Software, Inc. v. Newman*, 473 S.E.2d 527, 530 (Ga. Ct. App. 1996) ("Because [the defendant] had probable cause, its actions in filing the charges were not outrageous.").

Probable cause is conclusively established under Georgia law where a trial court denies the criminal defendant's motion for a directed verdict or where a jury convicts the defendant—at least absent any allegation of fraud, perjury, or subornation. *See Monroe v. Sigler*, 353 S.E.2d 23, 25 (Ga. 1987); *see also Akins v. Warren*, 375 S.E.2d 605, 606 (Ga. 1989) ("[P]robable cause is established when a trial judge denies a motion for directed verdict of acquittal in a criminal prosecution after hearing the state's evidence. However, this can be overcome by proving the order denying the motion was procured by use of fraud or corruption."); *Hartshorne v. Smith*, 30 S.E. 666, 667 (Ga. 1898) ("[T]he verdict of a jury finding the fact that the defendant in the criminal case was guilty of the

offense with which he stood charged is conclusive on the question of probable cause . . . , unless it should appear that the conviction was procured by fraud, perjury, or subornation[.]").

Here, the defendants had probable cause for the search and arrest because the trial court denied Mr. Bartlett's motion for a directed verdict and because the jury later convicted him. And the Bartletts failed to allege any fraud, perjury, or subornation at the trial. Although the Bartletts claim that Officer Bickford's affidavit was false, they never claim that any false evidence made its way into trial. Indeed, the Bartletts alleged *nothing* about the criminal trial. Accordingly, the Bartletts' intentional infliction of emotional distress claim must be dismissed.

The Bartletts raise four arguments in response. First, the Bartletts contend that the directed verdict denial and the conviction do not conclusively show probable cause because Mr. Bartlett's conviction was "unanimously, directly, and wholly reversed as a matter of law on appeal." But Georgia law is clear that probable cause is conclusively established even if the guilty verdict is later "set aside." *Hartshorne*, 30 S.E. at 667; *see also Ga. Loan & Tr. Co. v. Johnston*, 43 S.E. 27, 28 (Ga. 1902) ("The general rule is that, if there be a judgment of conviction in the criminal prosecution, . . . such judgment, although subsequently reversed by an appellate tribunal, is conclusive evidence of probable cause[.]").

Second, the Bartletts argue that the defendants' "fabrications and misrepresentations during their investigation and prosecution led directly to the corruption of Mr. Bartlett's trial and a fraudulent

21-11112, *et al.*          Opinion of the Court                    37

verdict." But the Bartletts never alleged *anything* about the trial in their complaint. Nor did they ever attempt to explain how the defendants' misstatements during the investigation in any way "corrupt[ed]" the criminal trial. They had to do that to overcome the conclusive effect of the directed verdict denial and the jury verdict, and they didn't.

Third, the Bartletts point to our decision in *Blue v. Lopez*, 901 F.3d 1352 (11th Cir. 2018). In that case, we considered whether a trial court's order denying a criminal defendant's motion for a directed verdict served as conclusive proof of probable cause under § 1983. *Id.* at 1354. We held that it did not: "Federal law, not state law, governs the resolution of [§] 1983 claims. And federal law does not allow the denial of a motion for directed verdict to serve as conclusive evidence of probable cause." *Id.* at 1358. But, here, we are considering state law claims, not § 1983 claims. And under Georgia law, the denial of the directed verdict motion and the jury's verdict are conclusive. As a result, our decision in *Blue* does not apply to the Bartletts' state intentional infliction of emotional distress claim.

And fourth, the Bartletts insist that, even if the directed verdict denial and the criminal conviction doom Mr. Bartlett's intentional infliction of emotional distress claim, that says nothing about Mrs. Bartlett's claim. But, as we explained earlier, the defendants had probable cause to search and arrest Mrs. Bartlett because Captain Jack's paid substantial cash prizes to Officer Welch and others.

38                      Opinion of the Court            21-11112, *et al.*

*Conversion (Count Eight)*

The Bartletts also brought a count for conversion. The Bartletts alleged that the defendants "confiscate[ed] [their] property and money knowing the confiscation was being accomplished under false pretenses" and "refus[ed] to return [their] property and money." This claim fails for two reasons. First, the prosecutors are entitled to absolute immunity under Georgia law for securing judicially approved warrants. Second, the conversion claim fails because the defendants had probable cause.

<u>Absolute Immunity</u>

A prosecutor, as we explained above, is entitled to absolute immunity under Georgia law for actions that are "intimately associated with the judicial phase of the criminal process." *Holsey*, 377 S.E.2d at 201 (quoting *Barbera v. Smith*, 836 F.2d 96, 99 (2d Cir. 1987)). Here, the Bartletts alleged that the prosecutors confiscated their property by filing a complaint for the civil racketeering case, filing a motion in the civil case to freeze the Bartletts' assets, and securing a warrant with what the Bartletts say was "false evidence." But instituting a case, filing a motion, and securing a warrant are heartland prosecutorial functions that are "intimately associated with the judicial phase" of the litigation. *Imbler*, 424 U.S. at 430; *cf. Kalina*, 522 U.S. at 130 (holding that a prosecutor is absolutely immune for his "decision to file charges" and his "presentation of . . . [a] motion [for an arrest warrant] to the court"). Thus, the conversion claim falls to prosecutorial immunity.

21-11112, *et al.*          Opinion of the Court                    39

Probable Cause

The conversion claim also fails because the defendants had probable cause to seize the Bartletts' cash and property.  Conversion "consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation."  *Decatur Auto Ctr. v. Wachovia Bank, N.A.*, 583 S.E.2d 6, 7–8 (Ga. 2003) (quoting *Md. Cas. Ins. Co. v. Welchel*, 356 S.E.2d 877, 880 (Ga. 1987)).

But "[i]t has long been the law in Georgia 'that possession acquired fairly under legal process, is not a wrongful conversion.'"  *Taylor v. Gelfand*, 505 S.E.2d 222, 224 (Ga. Ct. App. 1998) (quoting *Smith v. Kershaw*, 1 Ga. 259, 261 (1846)).  "Rather, when the 'property of a person [is] seized under a valid process issued against him[,] . . . malice, want of probable cause, and termination of the proceeding in favor of the defendant in the process [must] be alleged and proved to support an action for damages against the persons causing the process to be issued and levied.'"  *Id.* (quoting *Fulton Grocery Co. v. Maddox*, 36 S.E. 647, 649 (Ga. 1900)).

Here, the defendants secured a warrant to seize the Bartletts' property, and, thus, seized the property under legal process.  So the Bartletts had to plausibly allege a "want of probable cause."  *See Fulton Grocery*, 36 S.E. at 649.  The Bartletts can't make that showing for two reasons.  First, as we described earlier, the defendants had probable cause to believe that Captain Jack's was paying cash

prizes to those who won on the games, in violation of section 16-12-35(g).  Second, Georgia law imposes a conclusive presumption of probable cause where, as here, the trial court denies a motion for a directed verdict and a jury convicts the defendant.  *See Monroe*, 353 S.E.2d at 25.  The state court's denial of Mr. Bartlett's directed verdict motion and the jury's guilty verdict were conclusive evidence of probable cause that he operated a gambling establishment.

Because the prosecutors are entitled to absolute immunity and because the defendants had probable cause to seize the Bartletts' property, the Bartletts' conversion claim fails.

### Abusive Litigation (Count Eleven)

The Bartletts' abusive litigation claim—which it brought only against the prosecutors—is also barred by prosecutorial immunity under Georgia law.  "[I]n initiating a prosecution and in presenting the [s]tate's case, the prosecutor is immune from a civil suit for damages under § 1983."  *Imbler*, 424 U.S. at 431.  Here, the Bartletts sue the prosecutors for just that—their "initiation, continuation, and procurement of the [c]ivil [racketeering] [a]ction."  The prosecutors are shielded by absolute immunity on the abusive litigation claim.  *See Robbins*, 402 S.E.2d at 344 (noting that the "decision to file . . . charges against an individual is an act intimately associated with the judicial phase of the [litigative] process").

21-11112, *et al.*          Opinion of the Court                    41

*Attorneys' Fees (Counts Six and Twelve), Punitive Damages*
*(Count Nine), and Injunctive Relief (Count Ten)*

The Bartletts also brought counts for punitive damages, injunctive relief, and attorneys' fees under 42 U.S.C. § 1988 and GA. CODE ANN. § 13-6-11. These claims, the parties agree, rise and fall with the Bartletts' substantive claims. Because the Bartletts' substantive claims fail, these claims must also fail.

*The Motion for Leave to Amend*

The Bartletts moved for leave to file a third amended complaint. Their proposed complaint would add two § 1983 claims: one for malicious prosecution under the Fourth and Fourteenth Amendments and one for excessive fines under the Eighth and Fourteenth Amendments. The district court denied the motion to amend. Because the excessive fines claim was unduly delayed and amending to add a malicious prosecution claim would be futile, we affirm.

Once the time to amend as a matter of right expires, a party "may amend its pleading only with the opposing party's written consent or the court's leave," which "[t]he court should freely give . . . when justice so requires." FED. R. CIV. P. 15(a)(2). "The thrust of Rule 15(a) is to allow parties to have their claims heard on the merits, and accordingly, district courts should liberally grant leave to amend when 'the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief.'" *In re Engle Cases*, 767 F.3d 1082, 1108 (11th Cir. 2014) (quoting *Foman v. Davis*, 371

U.S. 178, 182 (1962)).  Even so, the district court may deny a motion for leave to amend "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile."  *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).

### Excessive Fines Claim

The district court didn't abuse its discretion in finding that the excessive fines claim was "unduly delayed."  *See Burger King Corp. v. Weaver*, 169 F.3d 1310, 1319 (11th Cir. 1999).  "Although generally, the mere passage of time, without more, is an insufficient reason to deny leave to amend a complaint, *undue* delay may clearly support such denial."  *Hester v. Int'l Union of Operating Eng'rs, AFL-CIO*, 941 F.2d 1574, 1578–79 (11th Cir. 1991) (citation omitted).  "[A] district court has discretion to deny leave to amend when the moving party's delay was the result of bad faith, dilatory tactics, or sheer inadvertence, or when the moving party offers no adequate explanation for a lengthy delay."  *In re Engle Cases*, 767 F.3d at 1119.

Here, the district court didn't abuse its discretion in finding that there was a lengthy delay with no adequate explanation.  The Bartletts filed this case in August 2016.  In their complaint, the Bartletts alleged that the defendants seized their property—which is the basis for the excessive fines claim—in May 2015, over a year before they sued.  Yet the Bartletts didn't include their excessive fines

21-11112, *et al.*        Opinion of the Court                    43

claim in their complaint, their amended complaint, or their second amended complaint.  Instead, they waited until May 2020—almost four years after they filed the case—to move to add an excessive fines claim.

The Bartletts say that they waited all this time because "the jury's acquittal of Mr. Bartlett [in early 2018] on all [racketeering] charges establishes the lack of any factual or legal basis for the sei-zure and civil forfeiture of [the Bartletts'] property and assets upon which [the] Eighth Amendment claim is based."  But the Bartletts never explain why they waited more than two years *after* the ac-quittal in 2018 to finally pursue their excessive fines claim.  On this point, the Bartletts only say the case was stayed for some time in the district court.  But, as the district court explained, the case wasn't stayed "until two months [after the acquittal], and even with the stay, [the Bartletts] could have moved to reopen the case to assert this claim."  We see no abuse of discretion.

Indeed, in *In re Engle Cases*, we affirmed the district court under similar circumstances.  There, the district court denied a mo-tion for leave to amend where there was a four-year delay.  *Id.* at 1118.  We rejected the plaintiffs' argument that the "defendants would not be prejudiced because [the cases] laid dormant on ac-count of [a] stay," reasoning that this stay did "not automatically excuse plaintiffs' counsel's four-year delay."  *Id.*  We emphasized that "prejudice to the nonmoving party is not the only factor courts consider; the reasons for the delay are also relevant."  *Id.* at 1119.  We explained that, putting prejudice to the side, the district court

44                    Opinion of the Court              21-11112, *et al.*

retained "discretion to deny leave to amend when the moving party's delay was the result of bad faith, dilatory tactics, or sheer inadvertence, or when the moving party offers no adequate explanation for a lengthy delay." *Id.* That's exactly what happened here. The Bartletts offered no good reason for their years-long delay. Thus, the district court didn't abuse its discretion in denying their motion as to the excessive fines claim.

<u>Malicious Prosecution Claim</u>

We also agree with the district court that the Bartletts' malicious prosecution claim fails because the officers are entitled to qualified immunity.[7] Unlike a false arrest or false imprisonment claim, "[m]alicious prosecution . . . requires a seizure 'pursuant to legal process.'" *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020) (quoting *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016)). A seizure is "pursuant to legal process" if it is "warrant-based" or if it "follow[s] an arraignment, indictment, or probable-cause hearing." *Id.*

"We can simplify our standard for malicious prosecution into two elements: the plaintiff must prove (1) that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against him terminated in his favor." *Luke v. Gulley*, 975 F.3d 1140, 1144

---

[7] The Bartletts don't challenge the dismissal of the malicious prosecution claim against the prosecutors, so they forfeit that part of the claim. *See Campbell*, 26 F.4th at 873.

21-11112, *et al.*        Opinion of the Court                45

(11th Cir. 2020). The Bartletts fall short at the first step because there was no violation of their right to be free from seizures pursuant to legal process.

To establish a violation of one's Fourth Amendment right to be free from seizures pursuant to legal process, "a plaintiff must establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Williams*, 965 F.3d at 1165. The plaintiff must prove that his seizure would not have been justified without legal process because, "[e]ven if an arrest warrant is invalid, we have held that a seizure is still constitutional if it would be reasonable without a warrant." *Id.* at 1164. "[A] 'brief period of detention' is lawful without some form of legal process," *id.* (quoting *Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975), so a malicious prosecution plaintiff must show that he was detained for more than a brief period.

The Bartletts failed to plausibly allege that their seizure would not have been justified without legal process because they never alleged that they were detained for more than a brief period. *See id.* Because the Bartletts insufficiently addressed this requirement in their proposed complaint, their malicious prosecution claim was futile. *See Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) ("Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed[.]").

### CONCLUSION

We affirm the district court's orders dismissing the Bartletts' claims against the prosecutors and denying the Bartletts' motion for leave to amend.  But we reverse the district court's orders denying the officers' motions for judgment on the pleadings.  Because the officers are entitled to qualified immunity on the Bartletts' claims, and they failed to state claims for relief, we remand for the district court to enter judgment on the pleadings for the officers.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART WITH INSTRUCTIONS.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 22, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  21-11112-JJ   ; 21-11113 -JJ   ; 21-11114 -JJ
Case Style:  Captain Jack's Crab Shack Inc, et al v. K. David Cooke, Jr., et al
District Court Docket No:  1:16-cv-02887-SCJ

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website. Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, <u>costs taxed against Captain Jack's Crab Shack, Inc. and Ronnie and Lee Bartlett.</u>.

Please use the most recent version of the Bill of Costs form available on the court's website at <u>www.ca11.uscourts.gov.</u>

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call <u>Tiffany A. Tucker, JJ</u> at <u>(404)335-6193</u>.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs